UNITED STATES of America,
Appellant,

v.

Edwin L. SHEAHAN and Deborah M.
Sheahan, Appellees.

No. 19826.

United States Court of Appeals
Fifth Circuit.

Sept. 24, 1963.

William A. Friedlander, Dept. of Justice, Louis F. Oberdorfer, Asst. Atty. Gen., Meyer Rothwacks, Lee A. Jackson, I. Henry Kutz, Attys., Dept. of Justice, Washington, D. C., Charles L. Goodson, U. S. Atty., Slaton Clemmons, Asst. U. S. Atty., for appellant.

Harold E. Abrams, Atlanta, Ga., Smith, Kilpatrick, Cody, Rogers & McClatchey, Atlanta, Ga., of counsel, for appellees.

Before RIVES and WISDOM, Circuit Judges, and BOOTLE, District Judge.

WISDOM, Circuit Judge.

This is an appeal by the United States from a judgment of the district court granting the taxpayers' claim for a refund based on Section 1034 of the Internal Revenue Code of 1954. This section allows a taxpayer, under certain conditions, to make a tax free sale of his "principal residence", if within a year he buys and "uses" another principal residence. The question for decision is whether the evidence is sufficient to sustain the jury's verdict that the taxpayers "used" their newly purchased property as their "principal residence" within one year from the date of the sale of their old residence.

The case was tried to the court and a jury. After the jury returned its verdict in favor of the taxpayers, the Government moved for a judgment notwithstanding the verdict and, in the alternative for a new trial. The district court denied the motions and granted judgment in favor of the taxpayers. We reverse.

Section 1034 (26 U.S.C.A. § 1034) provides:[1]

"(a) *Nonrecognition of gain.*—If property (in this section called 'old residence') *used* by the taxpayer as his *principal residence* is sold by him after December 31, 1953, and, within a period beginning 1 year before the date of such sale and ending 1 year after such date, property (in this section called 'new residence') is purchased and *used by the taxpayer as his principal residence,* gain (if any) from such sale shall be recognized only to the extent that the taxpayer's adjusted sales price (as defined in subsection (b)) of the old residence exceeds the taxpayer's cost of purchasing the new residence." (Emphasis added.)

As the Treasury Regulations, Sec. 1.1034–1(c) (3), properly state: "Whether or not property is used by the taxpayer as his residence, and whether or not property is used by the taxpayer as his principal residence (in the case of a taxpayer using more than one property as a residence), depends upon all the facts and circumstances in each case, including the good faith of the taxpayer." The essential facts here are virtually undisputed.

On May 8, 1957, the taxpayers, Dr. and Mrs. Edwin L. Sheahan, sold their home in St. Louis County, Missouri, for $270,000 in anticipation of Dr. Sheahan's iminent retirement from his post as a civilian physician for the Department of the Army. The Sheahans planned to buy a home in Atlanta, Georgia, and live with their daughter and her family. The Army, however, notified Dr. Sheahan that he would be retained in his position for a year. These post-retirement appointments are technically for a year but in practice frequently terminate when a suitable replacement is found. The Sheahans therefore continued in search of a new principal residence in Atlanta in order to move there promptly following Dr. Sheahan's release by the Army. During this time they resided with a second daughter in Godfrey, Illinois. Mrs. Sheahan made several trips to Atlanta in search of a suitable new home,

1. "Treasury Regulations on Income Taxes (1954 Code) provide:
SEC. 1.1034–1. *Sale or Exchange of Residence*—
\* \* \* \* \*
(c) *Rule for application of Section 1034*—
\* \* \* \* \*
(3) *Property used by the taxpayer as his principal residence.*—(i) Whether or not property is used by the taxpayer as his residence, and whether or not property is used by the taxpayer as his principal residence (in the case of a taxpayer using more than one property as a residence), depends upon all the facts and circumstances in each case, including the good faith of the taxpayer. The mere fact that property is, or has been, rented is not determinative that such property is not used by the taxpayer as his principal residence."

and on March 31, 1958, the taxpayers entered into a contract to purchase a partially completed house at 1265 Swims Valley Drive, Atlanta.

The new house was to be completed and the agreement closed on May 1, 1958, but bad weather caused several delays, and the final contract of sale was not signed until May 8, 1958, precisely one year after the sale of the taxpayers' St. Louis home. At that time Dr. Sheahan had not seen the house. Mrs. Sheahan, who had spent two weeks in Atlanta in March or April after the taxpayers had definitely decided to purchase the house at 1265 Swims Valley Drive, had never actually lived there.

The Sheahan's daughter, Mrs. D. T. Lauderdale, and her husband were planning to move into the new house with her parents. Mrs. Lauderdale had done work around the house and supervised some of the construction before May 8. She testified:

> "I spent a good bit of time there, checking on the construction, the builders, they didn't seem to feel they had much responsibility for supervising and I found that I had to, so I spent a good many days there, supervising and I would go over the workmen who were supposed to be there, and they wouldn't be there—I would say I spent about four—three to four days a week over there; not all the time, but a good part of the day from—all through April and May, and particularly there in—at the end."

During this period Mrs. Lauderdale did some painting around the house, planted shrubbery, and put up a mailbox with both her husband's and her father's names on it. She also moved in boxes of clothing and other articles belonging to her parents which had been stored in Atlanta after they sold their home in Missouri. She frequently would take a lunch with her and eat in the house.

No one actually slept in the house, however, until May 10, the date when the moving van brought the large pieces of furniture. The Lauderdale family moved in at that time. Mrs. Sheahan did not spend any time in the house until that summer, and although Dr. Sheahan spent two weeks there in June, he did not move in permanently until April 1959. There was no question, however, but that as early as March, 1958, the Sheahans intended to make the new house in Atlanta their principal place of residence and to live there with their daughter and her family.

The taxpayers argue that *intent* to use the new house as the taxpayers' principal residence, coupled with a subsequent use of the house as the principal residence, satisfy the statute. It is true that the good faith of the taxpayer is a circumstance to be weighed, and it may be the decisive factor in a close case in determining whether one of two houses is the *principal* residence, or whether the house is a *residence*, but there must be supporting facts to show that the taxpayer *used* the new property as his principal residence.

In a tax statute, as in any other statute, and whether the statutory purpose is remedial or punitive, the words of the statute must be given their ordinary meaning and they must be construed in harmony with the statute as an organic whole. Lewyt Corporation v. Commissioner, 1955, 349 U.S. 237, 75 S.Ct. 736, 99 L.Ed. 1029. See also Old Colony R. Company v. Commissioner, 1932, 284 U.S. 552, 52 S.Ct. 211, 76 L. Ed. 484; Helvering v. San Joaquin Fruit & Investment Co., 1936, 297 U.S. 496, 56 S.Ct. 569, 80 L.Ed. 824; Helvering v. William Flaccus Oak Leather Co., 1941, 313 U.S. 247, 61 S.Ct. 878, 85 L.Ed. 1310.

In William C. Stolk, 40 T.C. 345, (1963) the Tax Court discussed the meaning of "use", "principal", and "residence" as these terms are employed in Section 1034:

> "The ordinary meaning of 'use', 'principal', and 'residence' are clear and well understood, but if dictionary definitions are helpful in recalling the common meanings (see

Webster's Unabridged Third New International Dictionary), use (the verb) means a 'putting to service of a thing'; principal means 'chief or main'; and residence means 'the place where one actually lives or has his home.' The context in which 'used' occurs, referring to the 'old residence', connects 'used' with the taxpayers' 'principal residence', thereby making it clear that the property which is sold shall be utilized as the principal residence."

■ Both the wording and the legislative history of Section 1034 indicate that there must be some actual use, or physical occupancy of the new house in order to satisfy the requirements of the provision. Thus, under the terms of the statute the new property must be "purchased *and used* by the taxpayer as his principal residence" within one year of the sale of the old residence. The absence of any words such as "intended", "treated", or "regarded" and the choice of the word "used" is some evidence that in framing Section 1034 Congress focused on the physical or objective aspects of occupancy rather than on the subjective aspects. See E. C. Schroeder Co. v. Clifton, 10 Cir., 1946, 153 F.2d 385, 390; cert. den'd, 328 U.S. 858, 66 S.Ct. 1351, 90 L.Ed. 1629; reh. den'd, 329 U.S. 821, 67 S.Ct. 33, 91 L.Ed. 699. A further indication that "use" means "occupancy" is given in the Senate hearings on an amendment allowing the taxpayer an additional six months in which to use a house which he has begun constructing

within a year of the sale of the old one.[2] The Senate Report states:

"However, under the House bill, where a replacement residence is constructed by the taxpayer, he must occupy the new residence within one year after sale of his old residence. This is the same rule which both your committee's bill and the House bill apply in the case of the purchase of a new residence. However, in the case of new construction *the requirement of occupancy within one year* appears to your committee not to be realistic, particularly during the present period of material and labor shortages." S.Rep. No. 781, 82d Cong., 1st Sess. p. 35; 1951–2 Cum. Bull. 458, 483. (Emphasis added.) In other words, the taxpayer must "occupy" the new house; he must move in and live in the house before the lapse of twelve months after the sale of the old one. This sort of occupancy—actual or physical occupancy—can be accomplished only when the house is completed.[3]

As far as we find, the particular problem here involved—whether a new house, eventually used as a principal residence, was so used within the statutory period —has been litigated only once before. In John F. Bayley, 35 T.C. 288 (1960) the taxpayer was building a new home, and when it became clear that it would not be finished by October 15, 1955, the date the statutory period expired, he wrote the District Director of Internal Revenue requesting an extension. He was informed that this would be im-

2. "Section 1034(c) (5) provides:
"* * * In the case of a new residence the construction of which was commenced by the taxpayer before the expiration of one year after the date of the sale of the old residence, the period specified in subsection (a), and the 1 year referred to in paragraph (4) of this subsection, shall be treated as including a period of 18 months beginning with the date of the sale of the old residence."
The taxpayers do not claim to be entitled to the 18 month provisions of section 1034(c) (5), because they concede that it is undisputed that the new res-

idence at 1265 Swims Valley Drive, Atlanta, was habitable prior to May 8, 1958, the date on which the final contract of sale was signed.

3. See also the report of the House Ways & Means Committee, accompanying the bills that became the Internal Revenue Code of 1954 (H.Rep. No. 1337, 83d Cong., 2d Sess., pp. 79, A268–269 (3 U.S.C. Cong. & Adm.News (1954) 4017) and the report of Senate Finance Committee on the same bills (S.Rep. No. 1622, 83d Cong., 2d Sess. pp. 109, 427 (3 U.S.C. Cong. & Adm.News (1954) 4621).

possible; therefore, on October 14 he moved some of his furniture into an upstairs room which had just been walled off. The taxpayer continued to live elsewhere for two more months before he moved into the new house with the rest of his furniture. Although recognizing the good faith of the taxpayer and his unquestioned intent to use the new house as his principal residence, the Tax Court, as a matter of law, disallowed the nonrecognition of gain on the sale of his old residence, stating:.

"The facts of the instant case do not, in our opinion, establish that the petitioners *physically occupied or lived in the new residence on or before* October 15, 1955, the date when the statutory 18-month period expired. Indeed the rather extensive state of incompletion of the new residence—no water or sewerage connections, no appliances in the kitchen, and lights and flooring only in minimal quantities—effectively prevented petitioners from living in the new residence until long after October 15, 1955. Petitioner John Bayley conceded on cross-examination that *they did not sleep in the new residence* until December 28, 1955. Actually, from October 15 to November 15, petitioners continued to live in the house which they had been renting; and from November 15 until December 28, they made their home with various friends. In such circumstances, we feel impelled to hold that within the specified 18-month period, the new residence was not used by the petitioners as their principal residence, within the meaning of the statute. * * * "We fully recognize the equity of the petitioners' position on this issue, for they undoubtedly intended and diligently attempted to meet the statutory requirements for nonrecognition of the gain from the sale of their own residence. But Congress, for reasons satisfactory to it, has established a fixed eighteen-month period within which such require-

ments must be met; and we feel impelled to conclude that petitioners did not meet these requirements within that fixed period." (Emphasis added.) 35 T.C. at p. 296, 297.

Ralph L. Trisko, 29 T.C. 515 (1957) does not compel a different conclusion. There the issue was whether the taxpayer's old house retained its status as his principal place of residence while it was rented during his absence from the country. When such rental takes place it is necessary to examine all the facts and circumstances, "including the *bona fides* of the taxpayer" to determine whether this use was intended "in contradistinction to property used in trade or business", that is, as a residence. The Tax Court found only that the rental was a use "in contradistinction", limiting its decision strictly to the facts before it. That case is not authority for the proposition that intent without physical occupancy is sufficient to make a newly acquired house one's principal place of residence.

The taxpayers, however, urge that even if intent by itself is not enough, there was nonetheless sufficient use of the new house by Mrs. Lauderdale on their behalf to bring them within the terms of the statute. They point to the fact that the Sheahans and Lauderdales planned to live in the house at Atlanta as one family group and that they subsequently did so. Thus Mrs. Lauderdale was "using" the house on behalf of the entire family unit when she supervised the builders, ate lunches there, planted shrubbery, put up a mailbox with the Sheahan's name on it, and moved in boxes of the Sheahan's belongings.

There are two difficulties with this argument. First, the Sheahans and Lauderdales did not in fact constitute a single family unit until April 1959, when Dr. Sheahan moved permanently to Atlanta. The taxpayers were not in the position of, for example, a student who, although living temporarily at a college or university, maintains his place of residence with his family. The

Sheahans and Lauderdales had functioned as two autonomous family groups, maintaining separate residences before the move to Atlanta, and it is difficult to see how Mrs. Lauderdale's activities can be attributed to the Sheahans, who at that time had been living with another daughter in Godfrey, Illinois, for almost a year.

In Biltmore Homes, Inc. v. Commissioner, 4 Cir., 1961, 288 F.2d 336, a similar argument was made. There the taxpayer had lived with his parents until his marriage in September 1949. His parents continued living in the old residence, which the taxpayer sold to his mother in 1951. Two days before this sale, the taxpayer and his wife moved from a rented house into a new one which they had recently purchased at a price in excess of that which the taxpayer's mother had paid for the old home. The taxpayer sought to avoid recognition of gain on the old home by contending that his parents' home was his principal place of residence until he and his wife moved into their new house. The Fourth Circuit rejected this argument, pointing out that after the taxpayer married and moved out of his parents' home, the house which he and his wife rented was his principal place of residence. In William H. Evans, 21 T.C.M. 339 (1962) the taxpayer had owned and maintained a residence in Neenah, Wisconsin, he and his mother residing there until 1952, when he moved to Milwaukee, ninety miles distant, to practice law. In Milwaukee he lived in his sister's home. In 1956 he sold the old house and bought a new one in which the mother lived until 1960. The taxpayer purchased several appliances for the new house, made repairs from 1956 to the date of trial, and paid the taxes and insurance. The court pointed out that the taxpayer had never stayed at the new Neenah house except on some weekends and ruled that this was no evidence at all that that house had ever been used as his principal residence within the meaning of Section 1034.

Second, even if Mrs. Lauderdale's activities other than putting up the mailbox and moving in boxes of the taxpayers' belongings could inure to the Sheahans' benefit, this token "use" of the house before May 8 was insufficient to satisfy the statutory requirements of the statute. Thus, in John F. Bayley, 35 T.C. 288 (1960), the Tax Court held that the taxpayer's activities in moving furniture into one room of a partially completed house did not constitute the required use. It stated:

"We believe that the 'use' of the new residence, as contemplated by Congress in the enactment of section 1034, is physical occupancy, i. e., that the owners must live therein. * * * The facts of the instant case do not, in our opinion, establish that the petitioners physically occupied or lived in the new residence on or before October 15, 1955, the date when the statutory eighteen month period expired. Indeed, the rather extensive state of incompletion of the new residence—no water or sewerage connections, no appliances in the kitchen, and lights and flooring only in minimal quantities —effectively prevented petitioners from living in the new residence until long after October 15, 1955."

In William C. Stolk, 40 T.C. 345, (1963) the Tax Court had before it both the question whether the old property was used as the taxpayer's principal residence and also the question whether the new property was used as the principal residence. The Court held that

"With respect to each property, petitioner's *use* thereof is determinative. His *use* must be equated with the statutory requirement of 'principal residence.' * * * Petitioner's occupancy and use of the Eden Farm residence during weekends and holidays did not constitute using that residence as his principal residence within a period of one year after the sale of the Chappaqua property. * * * In order to meet

the prescribed requirement, the taxpayer must prove that the new property was his *principal* residence. It is not enough to establish that he occupied and used the new property as a residence. It is true that petitioner moved his chief household furnishings into the main dwelling house at Eden Farm within three months after it was purchased; that the main dwelling there was in condition to be lived in; and that petitioner and his wife lived there during weekends and holidays in 1955 and 1956, within the one-year post-sale period. But such use and occupancy was not sufficient to constitute Eden Farm as petitioner's principal residence during the one-year period involved."

On May 8, 1958, the day which terminated the statutory period of one year following the sale of the old residence, the Atlanta house was an empty shell, barren of furniture and unusable as a residence, principal or otherwise. On March 8, 1958, almost all of the taxpayers' clothes, furniture, and personal belongings were either in storage or being used by them in Godfrey, Illinois. At no time during the statutory period had Dr. Sheahan ever seen the house in Atlanta which he was allegedly using as his principal residence. And Mrs. Sheahan had done no more than inspect it. It is true that there is no mechanical test for determining a taxpayer's principal place of residence and that it depends upon all the facts and circumstances of the particular situation. There must, however, be some approach to actual occupancy; the taxpayer must, in effect, "move in." Nothing of the sort occurred here.

We hold that the trial judge erred in not directing a verdict and in not granting the appellant's motion for judgment notwithstanding the verdict. The Judgment of the lower court is Reversed with directions that the judgment be entered in favor of the United States.