GLEN M. KING AND ELIZABETH A. KING, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 864–78.    Filed May 16, 1979.

---

[6] In calculating the amount deductible we used the following formula:

$$X = \frac{\$6,180.51}{\$59,595.77} \times \$7,001$$

Glen M. King and Elizabeth A. King, pro se.
*Robert J. Percy*, for the respondent.

Scott, *Judge:* Respondent determined a deficiency in petitioners' income tax for the calendar year 1975 in the amount of $1,976.75.

The issues for decision are:

(1) Whether petitioners are entitled to a credit under section 44, I.R.C. 1954,[1] in connection with the construction of a house in Bridgton, Maine; and

(2) The amount of deduction for medical expenses to which petitioners are entitled.

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Petitioners, husband and wife, who resided in Groton Long Point, Conn., at the time of the filing of the petitioner herein, filed a joint Federal income tax return for the calendar year 1975 with the Andover Service Center, Andover, Mass. Petitioners reported their income on the cash receipts and disbursements basis.

Glen M. King (hereinafter petitioner) served as a naval officer for some years prior to his retirement from the Navy on August 31, 1976.

On January 21, 1972, petitioners purchased a lot in Bridgton, Maine, at a cost of $12,000 with the intention of building a home to reside in after petitioner's retirement from the Navy. In the spring of 1974, petitioner made an application for a construction loan for the purpose of building a house on this lot. On July 7, 1974, petitioner had a soil analysis of the lot done and shortly thereafter applied for a building permit. The permit was not granted because as of July 1, 1974, the State of Maine had put a building moratorium on shoreline construction. The notice of this moratorium was not received by the person considering petitioner's building permit until July 14, 1974, but since the

---

[1] All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise stated.

moratorium was retroactive to July 1, 1974, and petitioner's application was made after that date, the building permit was not granted to petitioner. Petitioner discussed with the town manager and code enforcement officer of the town of Bridgton the fact that he had discussed with them his building plan in June of 1974 and for this reason his application date should be considered to be prior to July 1, 1974, even though his formal application was after that date. These officials, however, refused to consider petitioner's application as made prior to July 1, since his formal written application was made after that date. They did, however, allow petitioner without a permit to have certain excavation work done on the lot. In July 1974, petitioner had stumps pulled from the property and removed; grading and filling done for a roadway; excavation made for a space for a septic tank and pump holes; a trench dug to lead to a leaching field and lines to that field laid; and grading, filling, leveling, and marking done for a foundation site. The spaces for footings were dug, but no forms were made or any concrete poured since no work of this type was allowed by the code enforcement officer to be done without a building permit. Because petitioner's construction loan was not granted when he was unable to obtain a building permit, petitioner did not have readily available the $1,800 to pay the person doing the excavation for the work done in July 1974. This work was not actually paid for by petitioner until July 1975.

The moratorium on construction on shoreline areas was lifted by the State of Maine on September 30, 1974. Because petitioner did not believe certain types of construction in Maine could be satisfactorily done in the winter months, he did not reapply for a building permit until May 1975. On May 2, 1975, petitioner reapplied for a building permit and the permit was received on May 9, 1975. Petitioner at this time again applied for a construction loan and on August 13, 1975, received a construction loan of $42,232.28. Of this amount, $3,855.28 was used to pay off the land purchase mortgage. Thereafter, petitioner proceeded with construction of the house and as of January 1, 1977, had utilized all but $3,358.24 of the amount received as a construction loan.

In the spring of 1976, with a view toward obtaining other employment after his retirement, petitioner made a number of applications for work in the Bridgton, Maine, area. He was given

encouragement with respect to some of his applications, but did not actually receive any offer of a position.

In September 1976, shortly after petitioner's retirement from the Navy, petitioners moved most of their furniture to the house in Bridgton, Maine, which was close to completion. When petitioner did not obtain any of the positions he was attempting to get in the Bridgton, Maine, area, he rented a house in Groton, Conn., in September 1976 and began looking for employment in the Groton, Conn., area. The house petitioners rented in Groton was partially furnished and they moved a portion of their furnishings which had not been moved to the house in Bridgton, Maine, into the Groton, Conn., house. In November 1976, petitioner accepted employment with the General Dynamics Corp. (General Dynamics) in Groton, Conn., and began his employment on November 30, 1976. Petitioners continued to live in the house they had rented in Groton, Conn., and petitioner continued to be employed in Groton by General Dynamics throughout the balance of 1976 and the ensuing years. Petitioners were still living in the house in Groton, Conn., and petitioner was still employed at General Dynamics in Groton, Conn., at the time of the trial of this case in November 1978. Petitioners intend to remain in Groton until at least June of 1979 when one of their sons graduates from high school.

Petitioners have never stayed in the house at Bridgton, Maine, except for some weekends. Petitioner has spent a majority of his weekends in the house at Bridgton, Maine, since the fall of 1976, and on some occasions his family has joined him there for weekends.

During the year 1975, petitioners made medical expenditures in the amount of $793.85 consisting of the following items:

| | |
|---|---|
| Payments to Dr. Fales, D.D.S | $545.00 |
| Travel for medical purposes | 25.00 |
| Payments to Dr. Saxe | 40.00 |
| Payments to Institute of Living | 42.85 |
| Eye Glasses for Mrs. King | 141.00 |
| Total | 793.85 |

On their 1975 Federal income tax return, petitioners claimed a tax credit under section 44 in the amount of $1,887. On their 1975 return, petitioners claimed total medical expenses of $1,032 and after subtraction therefrom of 3 percent of their reported

gross income claimed a deduction of $359. Respondent, in his notice of deficiency, disallowed the credit claimed by petitioners under section 44 for purchase or construction of a new principal residence and disallowed in full the deduction for medical expenses claimed by petitioners.

## OPINION

Section 44 provides for the allowance of a credit against income tax of an amount equal to 5 percent of the purchase price of a new principal residence purchased or constructed by a taxpayer, the construction of which began before March 26, 1975.[2] The term "new principal residence" means a principal residence within the meaning of section 1034, the original use of which commences with the taxpayer. The section applies only to a new principal residence which is acquired and occupied by the taxpayer after March 12, 1975, and before January 1, 1977.

Respondent makes several arguments in support of his determination that petitioners are not entitled to the credit provided by section 44. His principal arguments are: (1) That construction of petitioners' house in Bridgton, Maine, was not begun before March 26, 1975; and (2) that the house was not occupied by petitioners as their principal residence after March 12, 1975, and before January 1, 1977.

The argument respondent advances with respect to construction not being begun prior to March 26, 1975, requires merely a

---

[2]SEC. 44. PURCHASE OF NEW PRINCIPAL RESIDENCE.

(a) GENERAL RULE.—In the case of an individual there is allowed, as a credit against the tax imposed by this chapter for the taxable year, an amount equal to 5 percent of the purchase price of a new principal residence purchased or constructed by the taxpayer.

*        *        *        *        *        *        *

(c) DEFINITIONS.—For purposes of this section—

(1) NEW PRINCIPAL RESIDENCE.—The term "new principal residence" means a principal residence (within the meaning of section 1034), the original use of which commences with the taxpayer, and includes, without being limited to, a single family structure, a residential unit in a condominium or cooperative housing project, and a mobile home.

(2) PURCHASE PRICE.—The term "purchase price" means the adjusted basis of the new principal residence on the date of the acquisition thereof.

*        *        *        *        *        *        *

(e) PROPERTY TO WHICH SECTION APPLIES.—

(1) IN GENERAL.—The provisions of this section apply to a new principal residence—

(A) the construction of which began before March 26, 1975,

(B) which is acquired and occupied by the taxpayer after March 12, 1975, and before January 1, 1977, and

(C) if not constructed by the taxpayer, which was acquired by the taxpayer under a binding contract entered into by the taxpayer before January 1, 1976.

factual determination. Respondent does not contend that the grading and excavation work done on the property in July 1974 was not the commencement of construction. Respondent argues that we should not believe petitioner's testimony that this work was done in July 1974, but should find on the basis of documentary evidence that the work was actually done in July 1975. The invoices for the work, which petitioner paid in July 1975, do show workdays in July 1975. Petitioner, however, unequivocally testified that the work was done in July 1974 and the dates of the work shown on these invoices were incorrect. He even testified to his conversations with the code examiner of the town of Bridgton with respect to permitting this work to be done without the building permit. In order to hold as respondent contends we should, we would effectively be saying petitioner committed perjury. Petitioner was questioned in detail about the invoices on which respondent relies and explained the error in date and his absolute knowledge that the work was done in July 1974. From observation of petitioner while he testified, we accept petitioner's testimony as truthful and have found on the basis of that testimony that the excavation work was in fact done in July 1974.

Whether petitioner met the requirement of section 44(e)(1)(B) of occupying the house in Bridgton, Maine, after March 12, 1975, and before January 1, 1977, is a legal question. The facts are not in dispute. Petitioner and his family never lived on a regular basis in the house after it was completed and were not living there at the time of the trial. Approximately three-quarters of their furniture was moved into the house in Bridgton in September 1976, and petitioner spent a number of weekends in the house and his family a few weekends in the house during the balance of 1976 and the ensuing years. Petitioner argues that this constitutes occupying the house within the meaning of section 44(e)(1)(B). Section 1.44-2(b), Income Tax Regs., provides that:

A taxpayer "occupies" a residence when he or his spouse physically occupies it. Thus, for example, moving of furniture or other household effects into the residence or physical occupancy by a dependent child of the taxpayer is not "occupancy" for purposes of this paragraph. The credit may be claimed when both the acquisition and occupancy tests have been satisfied. * * *

Petitioner claims that since he occupied the Bridgton house on a number of weekends he has met the requirement of this

section of the regulations. Respondent, on the other hand, argues that the provisions of section 44(e)(1)(B) require that a taxpayer occupy the new house as his principal residence. Section 44(e)(1) states that the provisions of the section apply to "a new principal residence" and then subparagraph (B) states "which is * * * occupied by the taxpayer." The introductory paragraph to section 1.44-2, Income Tax Regs., is that: "The provisions of section 44 and the regulations thereunder apply to a new principal residence which satisfies the following conditions:" In our view, the clear import of the statute and regulations is that the taxpayer must occupy the new house as his "principal residence."

Section 44(c)(1) provides that the term "new principal residence" means a principal residence within the meaning of section 1034. It has long been recognized that the moving of furniture into a house or the spending of weekends in a house does not make that house a taxpayer's principal residence within the meaning of section 1034. A taxpayer must live in a house on a regular day-to-day basis in order for the house to be his "principal residence" within the meaning of section 1034. *Bayley v. Commissioner*, 35 T.C. 288, 297 (1960); *Stolk v. Commissioner*, 40 T.C. 345, 353 (1963), affd. per curiam 326 F.2d 760 (2d Cir. 1964); *United States v. Sheahan*, 323 F.2d 383 (5th Cir. 1963). In both the *Bayley* and *Sheahan* cases, the record was clear that the taxpayer intended to occupy the new house as a principal residence but had not done so within the time provided for such occupancy by section 1034. As was pointed out in *Shaw v. Commissioner*, 69 T.C. 1034, 1038 (1978), the limitations of section 1034 have been recognized and consistently given effect even though the result may seem harsh.

Because of the provision of section 44(c)(1) defining "new principal residence" to mean "principal residence" within the meaning of section 1034, the only reasonable construction of section 44 is that in order to be entitled to the credit provided by that section a taxpayer must occupy the newly constructed house as a principal residence between March 12, 1975, and January 1, 1977, by living in the new house on a day-to-day basis. In this case, petitioner's principal residence was in his rented house in Groton, Conn. We, therefore, sustain respondent's disallowance of petitioner's claimed credit under section 44.

The amount petitioners are entitled to deduct for medical

expenses is a question of fact. The parties agree that petitioners have established all the items which were listed in our findings as medical expenditures made by petitioners in 1975 except the $141 for eye glasses. Based on petitioners' testimony, supported by checks, we have found from the record that in addition to the agreed expenditures, petitioners in 1975 spent $141 for eye glasses. We, therefore, hold that petitioners made medical expenditures in 1975 of $793.85. In order to obtain the amount of petitioners' deduction for medical expenses in 1975, this amount of $793.85 must be reduced by 3 percent of petitioners' gross income.

*Decision will be entered under Rule 155.*