WILLIAM F. and ELIZABETH T. PECK, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Peck v. Commissioner
Docket No. 12528-81.
United States Tax Court
T.C. Memo 1982-506; 1982 Tax Ct. Memo LEXIS 239; 44 T.C.M. (CCH) 1030; T.C.M. (RIA) 82506; September 8, 1982. William F. and *240 Elizabeth T. Peck, pro se. M. K. Mortensen, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined a deficiency in petitioners' income tax for the calendar year 1977 in the amount of $5,169.40. Some of the issues raised by the pleadings have been disposed of by agreement of the parties, leaving for our decision the following: (1) whether petitioners are entitled to nonrecognition under section 1034[1] of the gain on a residence they sold on May 23, 1977, which was located in Cypress, California, because of having purchased a residence in Solana Beach, California, on January 31, 1975; and (2) whether petitioner Elizabeth T. Peck was engaged in the business of being a real estate saleswoman during the year 1977 so as to be entitled to deductions for expenses incurred in connection with that activity and, if so, the amount of deduction. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners, husband and wife, who resided *241 in Solana Beach, California, at the time of the filing of the petition in this case, filed a joint Federal income tax return for the calendar year 1977. Prior to January 31, 1975, petitioners resided in a home they owned in Cypress, California. Mr. Peck was employed by the Navy in the Long Beach, California, area near petitioners' home in Cypress, California. Mrs. Peck was a real estate saleswoman in the Cypress, California, area while they resided in that area. In 1974, Mr. Peck was transferred by the Navy to the Point Loma Naval Station near San Diego, California. He was informed that it would be necessary for him to live in close proximity of the Point Loma Naval Station since there would be work to be done at sea. When Mr. Peck was first transferred to the Point Loma Naval Station, he commuted from Cypress, California. On January 31, 1975, petitioners purchased a home in Solana Beach, California, a suburb of San Diego, California, near the Point Loma Naval Station. The purchase price of the residence was $72,250. Petitioners moved into the Solana Beach residence and lived there from January 1975 through June 1975. They attempted to sell their residence in Cypress, California, *242 without success during this period. From June 1975 to October 1976, petitioners moved back to Cypress, California, and continued to attempt to sell their residence there. In October 1976 petitioners moved back to the Solana Beach, California, residence and resided there from October 1976 until the time of the trial of this case. After October 1976, petitioners continued their effort to sell their home in Cypress, California, but also at that time placed the house on the rental market and attempted to rent the property. [2] On or about May 23, 1977, petitioners sold their residence in Cypress, California. The sales price was $72,000. The selling expenses were $448, and petitioners' basis in the residence was $33,680. Petitioners had purchased their Cypress residence in June 1965. Since 1962, Mrs. Peck has been a licensed real estate salesperson. From 1962 through part of 1974, she was connected with *243 various real estate firms in Orange County, California. Prior to 1973, Mrs. Peck had been financially successful as a real estate saleswoman. In 1973, she had gross income as a real estate saleswoman of $733 and expenses of $1,294. In 1974, 1975, and 1976, Mrs. Peck ceased most of her real estate sales activities and had no income and no expenses from this activity during these years. In January 1977, Mrs. Peck obtained a position as a real estate saleswoman with Beach CitiesRealtors. She joined the San Dieguito Real Estate Board at the request of this broker. Beach CitiesRealtors operated in the Solana Beach area. Mrs. Peck had been familiar with property in the Orange County area, but was not as familiar with property in the Solana Beach area. However, she actively solicited names from multiple listing books, called on persons who had placed classified advertisements of homes for sal by owners, and went on weekly tours of new listings sponsored by the San Dieguito Real Estate Board. She sent out various circulars and information in the mail to people in the area of the office in which she worked. She took an average of 30 hours per week of floor time in the broker's office. *244 Floor time refers to time spent by a salesperson sitting in the office answering calls from people who are inquiring about property which is advertised for sale or rent or people who are inquiring about listing their property for sale or rent with the broker. Often a person will call a broker's office to ask about a house that is advertised and the salesperson who is taking floor time will obtain a prospect for a sale in this manner. During 1977, Mrs. Peck showed various homes listed with the broker for whom she worked. She would show individuals homes on an average of two or three times a week. She also went out and interviewed people who were considering listing their homes for sale and went to homes that were multiple-listed to look into whether the property would be of interest to a client for whom she was attempting to locate a home. During 1977, Mrs. Peck had a number of persons referred to her by the broker for whom she worked who had called the broker to say that they were contemplating relocating in the San Diego area. Very often she would pick the prospects up at a motel, which might be as much as 30 miles from the office of the broker for whom she worked, and drive *245 them around for an entire day to see various properties and return them to the motel. In 1977, property in the Solana Beach area had become quite expensive and approximately nine out of ten of the persons to whom Mrs. Peck showed homes in the area of Solana Beach could not afford the price of the property in that area. The property in the area had risen rapidly in price in the 2 years immediately preceding 1977. In September 1977, Mrs. Peck transferred from the Beach Cities Realty office to the brokerage firm of Art Leitch of San Diego and worked out of the La Jolla office of this firm. She continued to take floor time of approximately 30 hours a week and also continued to show homes to clients of the broker and to call on prospects who were considering listing homes for sale with the broker with whom she was associated. Mrs. Peck stayed on with the La Jolla office of Art Leitch until the end of 1978. During the year 1977, Mrs. Peck paid the amounts shown below to the payee indicated: San Dieguito Board of Realtors
$204.00
San Dieguito Board of Realtors
21.10
Art Leitch Realtors
9.00
Multiple Listing, Membership
130.00
State of California, Dept. of Real Estate
8.00
La Jolla Board of Realtors
54.00
*246 During the entire year 1977 Mrs. Peck was a licensed real estate salesperson in the San Diego area. During 1977, petitiners had three relatively old cars. Mrs. Peck believed that her real estate activities would require her to have a better and newer car. In early 1977, Mrs. Peck purchased a Chrysler automobile for $9,402.40. [3] The Chrysler automobile was used almost exclusively by Mrs. Peck, and she used it primarily in connection weith her activities as a real estate saleswoman. However, she did drive it to and from her home to her office each day. Her office was 3 miles from her home. Occasionally Mrs. Peck drove the Chrysler on some personal errand. Generally, she drove one of the other cars on any personal errands. Petitioner drove the 1977 Chrysler 10,400 miles during 1977. The car generally obtained 10 miles to a gallon of gasoline, and gasoline cost approximately 70 cents a gallon in 1977. Petitioners incurred insurance expense and operating expenses other than gasoline in connection with the use of the 1977 Chrysler automobile in the year 1977 of $423.56. [4]
*247 Petitioners, on their 1977 Federal income tax return, did not report any gain from the sale of their residence in Cypress, California. They listed the sale of the property on their return with the statement that the sale was a tax-deferred transaction, since the cost of the replacement dwelling exceeded the sales price of the dwelling sold. On their joint Federal income tax return, petitioners also claimed a deduction for employee business expenses of $3,270.80 in connection with Mrs. Peck's activity as a real estate saleswoman. Respondent in his notice of deficiency determined that petitioners had a taxable gain on the sale of their residence in Cypress, California, of $18,936. He explained this determination as follows: You realized a long-term capital gain of $37,872.00 from the sale of property located at 4518 Lemon Circle, Cypress, California. The gain is taxable income subject to the 50 percent deduction provided by Section 1202 of the Internal Revenue Code. The gain on the property does not qualify for nonrecognition of gain under the provisions of Section 1034 of the Internal Revenue Code because a replacement residence *248 was not purchased within 18 months prior to the sale of 4518 Lemon Circle or 18 months after the sale. * * * Respondent also disallowed the claimed deduction of $3,270.80 of employee business expenses with the explanation that the amount was not allowable "because it has not been established that you were engaged in an activity for profit, that they were for ordinary and necessary business expenses or that they were expended for the purpose designated." OPINION Section 1034(a) as applicable to the year 1977 provided that if an old residence is sold by a taxpayer and a new residence is acquired within a period beginning 18 months before the date of such sale and ending 18 months after the date of the sale, the gain from the sale of the old residence shall be recognized only to the extent that the sales price of the old residence exceeds the cost of the new residence. [5]
*249 Petitioners admit that their Cypress, California, residence was not sold within 18 months after the date of the purchase of their new residence. In effect, they admit that the old residence was not sold within the time established by section 1034(a) for permitting nonrecognition of the gain from such sale. It is petitioners' position that because of the difficulty they encountered in selling their old residence and because Mr. Peck was required to move to San Diego in his work for the Navy, they should be entitled to nonrecognition of the gain on the sale of the old residence. In Shaw v. Commissioner,69 T.C. 1034 (1978), we were confronted with a situation substantially similar to that in the instant case. In that case, as here, the new principal residence was acquired after the expiration of the period allowed by section 1034(a) for nonrecognition of gain on the old residence. In holding that the nonrecognition provisions of section 1034 were not applicable, except where the purchase and sale occurred within the period provided in the statute, we stated (at 1038): The limitations of section 1034 have been challenged before, and each time the courts have recognized *250 and given effect to them. See, e.g., United States v. Sheahan,323 F.2d 383 (5th Cir. 1963); Kern v. Granquist,291 F.2d 29 (9th Cir. 1961); Elam v. Commissioner,supra [58 T.C. 238, 240 (1972), affd. per curiam 477 F.2d 1333 (6th Cir. 1973)]; O'Barr v. Commissioner,44 T.C. 501 (1965); Bayley v. Commissioner,35 T.C. 288, 294-297 (1960); McCall v. Patterson,155 F. Supp. 405 (N.D. Ala. 1957). For example, in Kern v. Granquist,supra, the court recognized that by applying the time limitations of section 1034, the result appeared to be harsh; nevertheless, after examining the statute, regulations, and legislative history, the court concluded that it was constrained to hold that costs paid after the described period could not be included. Similarly, in McCall v. Patterson,supra, the court held that the amount paid for the purchase of property before the beginning of the described period could not be included in applying section 1034. To be entitled to the benefit of section 1034, the petitioners have the burden of proving *251 that they have satisfied its requirements. * * * Petitioners in this case have shown that they made a conscientious effort to sell their Cypress, California, residence within 18 months after they purchased their Solana Beach residence, but were unable to make a sale within that time. However, this equitable factor does not bring them within the provisions of section 1034. See Elam v. Commissioner,58 T.C. 238 (1972), affd. 477 F.2d 1333 (6th Cir. 1973). We hold that the sale by petitioners of their Cypress, California, residence does not come within the provision of section 1034 and therefore we sustain respondent's determination that the gain on the sale of that property is subject to tax as long-term capital gain in the year 1977. It is well settled that in order for an activity to constitute the carrying on of a trade or business under section 162(a), it must be "entered into, in good faith, with the dominant hope and intent of realizing a profit, i.e., taxable income, therefrom." Hirsch v. Commissioner,315 F.2d 731, 736 (9th Cir. 1963), affg. a Memorandum Opinion of this Court. It is incumbent on the taxpayer to establish *252 that the primary purpose of the activity engaged in was that of making a profit. Dreicer v. Commissioner,78 T.C. 642 (1982), on appeal (D.C. Cir. June 1, 1982); Golanty v. Commissioner,72 T.C. 411, 426 (1979), affd. in an unpublished opinion 647 F.2d 170 (9th Cir. 1981). In making the determination of the profit motive, all relevant facts and circumstances are to be taken into account. Golanty v. Commissioner,supra at 426; Jasionowski v. Commissioner,66 T.C. 312, 319 (1976). No one factor is determinative, but greater weight is given to the objective facts than to the parties' mere statement of their intent. Engdahl v. Commissioner,72 T.C. 659, 666 (1979); Churchman v. Commissioner,68 T.C. 696, 701 (1977). In section 1.183-2(b), Income Tax Regs., the factors which normally are taken into account in determining whether an activity is entered into by a taxpayer for profit are stated to be: the manner in which the taxpayer carries on the activity; the expertise of the taxpayer or his advisers; the time and effort expended by the taxpayer in carrying on the *253 activity; the expectation that assets used in the activity may appreciate in value; the success of the taxpayer in carrying on other similar or dissimilar activities; the taxpayer's history of income or losses with respect to the activity; the amount of occasional profits, if any, which are earned; the financial status of the taxpayer; and whether elements of personal pleasure or recreation are involved. Most of the statements in the regulation of the factors to be considered were derived from cases decided prior to the enactment of section 183 providing for the extent to which deduction of expenses may be taken which are related to an "activity not engaged in for profit." The facts in this case clearly indicate that Mrs. Peck was engaged in her activity as a real estate saleswoman in the year 1977 as a business activity with the intent to make a profit. The record shows that Mrs. Peck had been a successful real estate saleswoman in the Orange County area of California prior to 1973; that she had some gross income from this activity in 1973; and that in 1974, 1975 and 1976 she ceased to actively engage in selling real estate because of her husband's transfer from the Long Beach *254 area of California to the San Diego area. The record shows that in early 1977 she became actively affiliated with a real estate firm in the San Diego area and worked diligently on a regular basis attempting to sell homes on a commission basis. The record also shows that petitioners needed the money Mrs. Peck might make from her real estate business since they had purchased a home in the San Diego area shortly after Mr. Peck was transferred to that area, but were unable to sell their home in the Long Beach, California, area until May 1977. Not only did Mrs. Peck testify unequivocably that she worked the hours she worked with the intent to make a profit, but all other facts clearly indicate that this was her intent. She carried on the activity in a businesslike manner; she had prior experience with real estate sales; she expended a full workweek at the activity; she had previously been successful in a similar activity; and, although she had ceased the activity for the years 1974 through 1976, her loss from the activity in the year 1973 was relatively minor. No losses or gains had occurred during the years she was not engaged in this activity and, in years prior to 1973, she had been *255 successful in the activity. Petitioners needed for Mrs. Peck to make a profit from the activity. Clearly she was not engaged in the activity for personal pleasure or recreation. The facts in this case are clear that Mrs. Peck was engaged in the activity of being a real estate saleswoman with the intent to make a profit. Based on this record, we conclude that petitioners are entitled to deduct the amounts paid by Mrs. Peck in 1977 to the San Dieguito Board of Realtors, the Art Leitch Realtors, the multiple listing membership, the Department of Real Estate of the State of California, and the La Jolla Board of Realtors totaling $426.10. Petitioners are entitled to deduct some of the cost of operating the 1977 Chrysler in 1977. It is clear from the record that most of the use of this automobile was in Mrs. Peck's business. Other than driving to and from her work, Mrs. Peck only occasionally used this automobile for other than business purposes. Mrs. Peck was the major, if not the only, user of the 1977 Chrysler. We conclude that 80 percent of the use of the 1977 Chrysler was by Mrs. Peck for business purposes. The expense of operating this automobile consisted of $423.56 for insurance *256 and other operating expenses, other than gasoline, and $728 for gasoline, making a total of $1,151.56. Depreciation on the automobile is claimed on a straight-line basis. The cost of the automobile of $9,402.40, a salvage value of $1,000, and a useful life of 3 years are to be used in computing depreciation on the 1977 Chrysler for the year 1977. Petitioners are entitled to deduct 80 percent of the $1,151.56 oprating cost of the automobile and 80 percent of the depreciation on the automobile as a business expense in connection with Mrs. Peck's activities as a real estate saleswoman. Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise stated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the year here in issue.↩
2. Petitioners incurred $1,545 of expenses in 1977 in connection with the Cypress, California, residence while they held it for rent and respondent has agreed and stipulated with petitioners that this $1,545 is properly deductible by petitioners in 1977 under section 212.↩
3. The parties have stipulated that if we conclude that a portion of the use of this Chrysler automobile was in a trade or business carried on by Mrs. Peck, the salvage value of the automobile was $1,000, and it is depreciable on a basis of a 3-year useful life. ↩
4. The parties have stipulated that petitioners incurred deductible interest expense of $6,841.38 plus $1,674.08 in the year 1977, and that included in the $1,674.08 amount is the interest paid with respect to the note given in connection with the purchase of the Chrysler automobile. Respondent concedes that the interest is deductible whether or not Mrs. Peck was engaged in a trade or business.↩
5. Sec. 1034(a) provided as follows: SEC. 1034. SALE OF EXCHANGE OF RESIDENCE. (a) Nonrecognition of Gain.--If property (in this section called "old residence") used by the taxpayer as his principal residence is sold by him and, within a period beginning 18 months before the date of such sale and ending 18 months after such date, property (in this section called "new residence") is purchased and used by the taxpayer as his principal residence, gain (if any) from such sale shall be recognized only to the extent that the taxpayer's adjusted sales price (as defined in subsection (b)) of the old residence exceeds the taxpayer's cost of purchasing the new residence.↩