GERALD EVANS and MARLENE D. EVANS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Evans v. Commissioner
Docket No. 5583-81
United States Tax Court
T.C. Memo 1982-623; 1982 Tax Ct. Memo LEXIS 127; 44 T.C.M. (CCH) 1512; T.C.M. (RIA) 82623; October 25, 1982. Gerald Evans, pro se. Gary A. Benford, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: This case was assigned to and heard by Special Trial Judge Fred R. Tansill pursuant to the provisions of section 7456(c) of the Internal Revenue Code[1] and Rules 180 and 181, Tax Court Rules of Practice and Procedure.[2] The Court agrees with and adopts his opinion which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE TANSILL, Special Trial Judge: Respondent determined a deficiency of $562.25 in petitioners' Federal income tax for the year 1978. The only issue *129 in controversy involves the petitioners' liability for recapture of a new principal residence credit under section 44(d)(1). Some of the facts are stipulated and are so found. Petitioners resided in Crowley, Texas, when they filed their petition in this case. Initially they elected to have this handled as a small tax case under the provisions of section 7463. However, before the trial of the case, they requested that it be treated and tried as a regular case. Their request was granted by the Chief Judge and the case was assigned to Special Trial Judge Tansill. Petitioners' original joint Federal income tax return for 1978 reflected no recapture provisions or amounts relating to recapture of credit upon purchase or construction of a new principal residence under section 44. An amended return for 1978, on Form 1040X, was filed by the petitioners with the respondent on May 21, 1979, in which was reflected a credit to be recaptured in the amount of $312. This information appeared on Form 5405 attached to the amended return. The same form reflected the fact that petitioners had acquired a new principal residence on November 25, 1975, with respect to which they claimed a credit *130 of $1,978.38. The same form reflected a sale of the original residence on October 31, 1977 with an adjusted sales price of the residence sold of $51,282. The purchase of a replacement residence occurred on November 20, 1977. The cost of the replacement residence was shown as $43,200 which, when subtracted from the adjusted sales price, left a balance of $8,082. Applying a percentage of.157599 percent, petitioners computed the credit to be recaptured at $311.79. Upon audit of the amended return, respondent increased the amount of credit to be recaptured from $312 to $864.25, thereby increasing petitioners' tax by $562.25, which is the deficiency here involved. At trial respondent advised the Court that the petitioners had made a mathematical error in their computation of withholding credits which was in the government's favor. Respondent, therefore, conceded that petitioners were entitled to an additional $421.99 of withholding credits. The issue here presented is whether petitioners are entitled to include the cost of a lot, upon which to locate their mobile home, as part of the cost of a replacement residence for the purposes of section 44(d)(2). It is respondent's *131 position that because petitioners did not purchase and occupy the lot upon which their mobile home was ultimately placed, within the appropriate replacement period of 18 months provided by law, the cost of the lot should not be included even though the cost of the mobile home admittedly was proper. It is petitioners' contention that the purchase of the mobile home and the land were consumated as a single integrated transaction, timely under the law. Petitioner was employed in 1978, and at all times material to this issue in prior years, by the G.C. Murphy Company as a store manager. His wife was employed at the same time as an office manager for an unrelated concern. Petitioners had purchased a new principal residence in Ft. Worth, Texas on November 25, 1975, and properly claimed a credit under section 44 of $1,978.38 on their 1975 tax return. Because of a change in Gerald Evans' assignment by the Murphy Company petitioner sold this residence on October 31, 1977 for a sales price of $55,000, less certain sales expenses of $3,718, leaving an adjusted sales price of $51,282. Because of the imminence of several moves incident to reassignment of Gerald Evans by his employer, *132 petitioners purchased a mobile home with improvements on November 20, 1977 for $28,621. The mobile home was manufactured to petitioners' specifications in Dallas, Texas and was an unusually large and sumptuous model. Containing approximately 1,700 square feet, it was moved on roads in two sections pulled by prime movers. These sections were assembled to form a single home once a site was reached. When the mobile home was purchased, petitioners planned to purchase a lot upon which it could be parked but had not yet selected an appropriate site. Meanwhile, after purchase, the mobile home was temporarily moved to rented space in a mobile home park in Crowley, Texas where petitioners and their two children moved in and occupied and used the mobile home as their residence. As noted, this occurred in November, 1977. In March, 1978, petitioners finally decided upon lot in Granbury, Texas as the site for the mobile home and purchased it for $13,700. At that time, although the lot was undeveloped, electricity, water and telephone services were available for hook-up. Subsequently, petitioners installed their own septic tank system, fencing and a pole for electrical wires. These improvements *133 on the lot in Granbury were made immediately prior to moving the mobile home to that lot in June, 1980. Until that occurred, petitioners did not "live" on the unimproved lot, although various housekeeping activities were engaged in, such as cutting grass and taking other steps to observe the zoning restrictions imposed by the community where the lot was located. As already noted, respondent contends that the cost of the Granbury lot should not be included with the cost of the mobile home to determine the cost of the "replacement residence." Petitioners make the opposite contention. Section 44A provides for a credit equal to 5 percent of the purchase price of a new principal residence purchased by a taxpayer, but not exceeding $2,000. Here that credit is agreed to be $1,978.38. Section 44(d)(1), in effect, then provides that where a principal home upon which such a credit was allowed is disposed of within 36 months after the original purchase, then the tax in the year in which the replacement period expires is to be increased by an amount equal to the credit previously allowed. This is termed "a recapture of a credit." However, section 44(d)(2) provides that where a taxpayer *134 purchases or constructs a new principal residence within the placement period described in section 1034, recapture shall not be required. Instead, for the taxable year following the year in which the disposition occurred, a formula is applied based upon the ratio of the amount of the original credit as compared with the adjusted sales price of the old residence, but reduced by the cost of the new. Section 1.44-5(b)(1), Income Tax Regs., provides that the adjusted basis of a factory-made home, includes the purchase price of land upon which the home "is located" but only if such land was acquired "prior to or in conjunction with the acquisition of [the] factory-made home." Section 1.44-5(e), Income Tax Regs., includes mobile homes in the definition of "factory-made home." Here the petitioners sold their principal residence which they had acquired on November 25, 1975, before the expiration of the 36 months period specified under section 44(d)(1) and purchased a replacement residence (the mobile home) within the 18 months replacement period referred to by section 1034. The price of the mobile home was $28,621, not including the cost of the lot - $13,700. Respondent takes the *135 position that because petitioners did not "purchase" and "use" the lot as part of their new principal residence, within the meaning of section 1034 and prior to the expiration of the replacement period, the credit must be recaptured. For a home to be a "principal residence" it must appear that a taxpayer physically occupied the home on a "regular day to day basis." United States v. Sheahan,323 F.2d 383 (5th Cir. 1963); Bayley v. Commissioner,35 T.C. 288 (1960). In Lokan v. Commissioner,T.C. Memo. 1979-380, this Court noted that where a trailer was purchased in conjunction with several acres of land, only that portion of the property "used" by the taxpayers for residence purposes should properly be considered as part of the trailer residence. The cases cited require that a taxpayer must have "actual occupancy" and must have, in effect, "moved in." Respondent argues that there was no "use" of the Granbury lot within the requisite statutory period, although there was admitted "use" of the mobile home itself. We agree with respondent. We find that the Granbury lot was not purchased prior to or in conjunction with the acquisition *136 of the factory-made mobile home and, consequently, the mobile home was not "located" on that lot at the time the home was purchased. Two separate and unrelated purchases are involved here.While the mobile home satisfies the test, the Granbury lot does not. In view of all of the foregoing facts and the record herein, we find and hold that petitioners do not meet the requisite statutory tests for avoiding a recapture of the home credit, to the extent of the Granbury lot. Because of other adjustments, Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated. ↩
2. Pursuant to the order of assignment, on the authority of the "otherwise provided" language of Rule 182, Tax Court Rules of Practice and Procedure↩, the post-trial procedures set forth in that rule are not applicable to this case.