T.C. Memo. 1996-333

UNITED STATES TAX COURT

DONALD D. BOWERS AND DEBORAH BOWERS, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 558-94.                          Filed July 24, 1996.

Donald D. Bowers, pro se.

<u>Judith C. Winkler</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

PARKER, <u>Judge</u>:  Respondent determined a deficiency in petitioners' Federal income tax for the year 1989 in the amount of $38,758, an addition to tax under section 6651(a)(1) in the amount of $1,868, and an accuracy-related penalty under section 6662 in the amount of $7,752.  By amendment to answer, respondent asserted an increased deficiency in income tax to the amount of

$46,217, an increased addition to tax under section 6651(a)(1) to the amount of $2,241, and an increased penalty under section 6662 to the amount of $9,243.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable year before the Court, and all Rule references are to the Tax Court Rules of Practice and Procedure.

The issues to be decided in this case are:

(1) Whether the Burlington, Connecticut, house was petitioners' principal residence so that they may defer recognition of the gain on the sale of that house in 1989 under section 1034;

(2) if not, what was the amount of petitioners' gain on the sale of the Burlington house that must be recognized in 1989;[1]

(3) whether petitioners are liable for the addition to tax under section 6651(a)(1); and

(4) whether petitioners are liable for the accuracy-related penalty under section 6662.

---

[1] The parties have phrased this issue as the determination of petitioners' basis; however, both parties have presented evidence and arguments concerning other elements of the calculation of gain and treated these as components of basis. Although the outcome will be the same, in the interest of technical clarity, we shall treat this as a question of the amount of gain.

FINDINGS OF FACT

Petitioners Donald D. Bowers (Mr. Bowers) and Deborah Bowers are husband and wife. They resided in Jacksonville, Florida, at the time they filed their petition in this case.

Connecticut Residences

Mr. Bowers was married to his former wife, Florence Bowers Keegan (Florence), from June 1, 1968, to April 15, 1988. They had three sons: Lonny, Kevin, and Duane. On November 10, 1978, Florence received title to certain improved property with the address of 71 Nassahegan Drive, Burlington, Connecticut (the Burlington house or property), for which Mr. Bowers and Florence paid $122,000. The Burlington property actually consisted of three lots or parcels of land.

Mr. Bowers and Florence had certain work performed on the Burlington property. Due to the limited water supply from the existing well, they caused three additional wells to be dug. They later sued the sellers of the Burlington property for the cost of these additional wells and recovered a judgment of $30,000. Mr. Bowers and Florence had some landscaping done. They converted one room from an office into a bedroom by adding an additional wall and a closet. They divided the basement to provide a room for the live-in maid they employed at that time. Mr. Bowers and Florence spent over $10,000 on wallpaper, painting, window shades, cleaning the carpets, and replacement of plumbing and lighting fixtures. The record does not establish

whether any of this work constituted improvements that increased their basis in the Burlington property or the amount of any such increase; at the time the property was sold over 20 years later, it was in a deteriorated, run-down condition.

In October of 1987, Mr. Bowers and Florence separated, and Mr. Bowers moved out of the Burlington house. He initially rented an apartment in Farmington, Connecticut, for the period from October 7, 1987, to May 7, 1988, for a total rent of $5,250 (or, $750 per month).

When Mr. Bowers and Florence were divorced on April 15, 1988, they agreed and the court ordered that:

> Real property located at 71 Nassahegan Drive, Burlington, Connecticut, and the adjoining lot shall remain with [Florence], as her residence, until sale, remarriage or at such time when the minor children reach the age of 18 years, whichever occurs first. [Florence] will not further encumber the property without [Mr. Bowers'] permission which must be requested and given in writing. An existing mortgage on the aforementioned property held by [Mr. Bowers] in the fact [sic] amount of $50,000.00 will be forgiven at the time of the sale assuming no further encumbrances are added by [Florence].[2] At the time the property is sold or when the youngest child reaches the age of 18 years, or remarriage, whichever occurs first, the property will be sold and the equity shall be shared equally.

During the court proceedings regarding this divorce agreement, Mr. Bowers represented that, in addition to the $50,000 mortgage,

---

[2] The U.S. Bankruptcy Court, District of Connecticut, had issued a judgment on July 6, 1987, that this same mortgage was decreed avoided. That judgment was entered in the Burlington land records on July 29, 1988.

the Burlington property was encumbered by a first mortgage of $60,000 and a second mortgage of $30,000. Florence was to make the mortgage payments on these two loans. Neither Mr. Bowers nor Florence was represented by counsel up through this point in their divorce proceedings.

The Burlington land records reflect the following encumbrances on the Burlington property as of April 15, 1988:

| Type | Face Amount | Date | In Favor of |
|------|-------------|------|-------------|
| Mortgage | $70,000 | Nov. 10, 1978 | Hartford Natl. Bank & Trust Co. |
| Mortgage | 49,000 | Mar. 21, 1980 | United Bank & Trust Co. |
| Mortgage | unknown | Apr. 23, 1980 | Hartford Natl. Bank & Trust Co. |
| Attachment | 100,000 | Aug. 20, 1980 | United Bank & Trust Co. |
| Attachment | 100,000 | Dec. 17, 1987 | Citytrust |

The land records also included two notices of lis pendens: one dated September 8, 1980, by Hartford National Bank & Trust Co. referencing the April 23, 1980, mortgage; and the second dated October 28, 1980, by United Bank & Trust Co. referencing the March 21, 1980, mortgage.

For the period May 7, 1988, to May 31, 1989, Mr. Bowers rented a two-bedroom condominium in Newington, Connecticut (the condo), for $895 per month. The lease included an option to purchase the condo for $149,900, on the conditions that Mr. Bowers notify the owners no later than August 30, 1988, of his decision to exercise the option, and that closing occur no later than November 30, 1988. Mr. Bowers did not exercise this option.

During a portion of Mr. Bowers' tenancy, the condo contained two bedroom sets, a dinette set, a sofa, a stereo, and sports and exercise equipment. The furniture was the type that had to be assembled. Mr. Bowers also kept his autographed boxing gloves, his trophies, and his golf clubs at the condo.

On November 21, 1988, Citytrust filed a release of attachment with respect to its December 17, 1987, attachment of the Burlington house. On November 29, 1988, the Superior Court for the Judicial District of Hartford/New Britain (the Superior Court) entered a Stipulation as to Modification of Dissolution Judgment. That stipulation provided that:

> [Florence] shall sell the premises known as 71 Nassahegan Drive, Burlington, Connecticut, and the adjoining lot and use her best efforts to receive the highest and most reasonable offer. The net proceeds from the sale shall be divided as follows:
>
> (a) Seventy-five (75%) percent to [Florence]; and
> (b) Twenty-five (25%) percent to [Mr. Bowers]
>
> The parties hereto shall use their best efforts to compromise the existing liens or encumbrances against the above-mentioned real estate including the claim by Citytrust Bank.

Other modifications to the original divorce judgment included increased alimony for Florence, but only until the sale of the Burlington house when all alimony would cease, and increased child support for Kevin and Duane. The Superior Court issued an order on January 31, 1989, in accordance with a stipulation by Mr. Bowers and Florence, that the mortgage held by Mr. Bowers was released; this order was recorded in the land records on March

29, 1989.[3]  Mr. Bowers and Florence each were represented by
counsel in this modification action.

The Mandarin Residence

On January 31, 1989, Mr. Bowers purchased a newly
constructed four-bedroom house located at 12476 Blueberry Woods
Circle West, Jacksonville, Florida (the Mandarin house or
property), for the price of $144,713.  Title to the Mandarin
property was placed in Mr. Bowers' name individually.  The sales
contract, which Mr. Bowers signed on December 27, 1988, included
the following extra features:  an upgraded lot ($2,000), brick
veneer ($6,300), additional phone, cable, and fan prewires ($20,
$25, and $60, respectively), three marble vanities ($600), pull-
down stairs ($175), shower door ($225), mantle ($150), and matrix
pad ($808).  The builder estimated that Mr. Bowers' monthly
payments, including amounts for the mortgage, insurance, and
taxes, would be $1,117.

In order to buy the Mandarin property, Mr. Bowers obtained a
mortgage in the amount of $130,000.  On the mortgage application,
Mr. Bowers stated that he did not intend to occupy the property
as a primary residence.  On the mortgage application, he included
the Burlington property among his assets and indicated that the

---

[3] Mr. Bowers later sued Florence on the purported underlying
debt, but the court ruled against him.

Burlington property was "pending sale".[4]  Other assets Mr. Bowers disclosed on the application included $29,827.59 deposited with the Federal Savings Bank in New Britain, Connecticut, and $4,966.10 deposited with the Tust Company Bank [sic] in Augusta, Georgia.

On February 18, 1989, Mr. Bowers married Deborah Scavone, now Deborah Bowers (Deborah).  Prior to their marriage, Deborah resided with her parents in Augusta, Georgia, where she had been attending Augusta College as a full-time student.  Petitioners' wedding took place in Augusta, and they returned to Augusta after their honeymoon.  Deborah spent about one-third to one-half of her first year of marriage in Georgia.  She spent some time at the Connecticut condo and some time at the Mandarin house in Jacksonville, Florida.

In the Mandarin house, the master bedroom was the only one of the four bedrooms that was furnished at first; it contained a bedroom set and a television.  This bedroom set was one of the two from the Connecticut condo.  Petitioners later purchased a brass bed and moved the first bed to another bedroom.  One of the bedrooms contained Mr. Bowers' exercise equipment which previously had been at the Connecticut condo.  Petitioners purchased additional furniture for the master bedroom, and a sectional sofa, table, and lamp for the family room; they also

---

[4] Mr. Bowers listed the Burlington property as having a present market value of $500,000 and a mortgage of only $67,633.

had a television in the family room. At some point in 1989, Mr. Bowers bought a 35-inch television for the Mandarin house. By the summer of 1989, petitioners had a leather sofa and chairs in the living room. A copper-tiered mirror hung in the foyer. The formal dining room was not furnished. The kitchen had a dinette set and matching bar stools of white rattan with pale blue cushions; the table top was glass. The refrigerator was a large side-by-side model with ice and water dispenser in the door. The kitchen was wallpapered, as were at least two of the bathrooms. Some of the rooms had fabric window treatments that matched the decor of the room. There was a kidney-shaped swimming pool in the backyard.[5]

## Sale of the Burlington House

On March 23, 1989, Florence received a mortgage loan from Connecticut National Bank in the amount of $45,921.30. The proceeds were used to pay off the loan on the Burlington house borrowed from Hartford National Bank & Trust Co. on April 23, 1980. This new loan was to be paid off in full on September 29, 1989. United Bank & Trust Co. released its attachment of the Burlington house on March 27, 1989.

On July 6, 1989, Mr. Bowers applied to First Performance Mortgage Corp. for a mortgage on the Burlington property in the

---

[5] In 1990, Mr. Bowers transferred title to the Mandarin property to Deborah by quitclaim deed. Petitioners sold the Mandarin house in late 1992.

amount of $150,000.  At that time petitioners may have contemplated the possibility of making the Burlington house their future home.

In mid-July of 1989, Florence moved out of the Burlington house.  She held a tag or garage sale there shortly after moving out and left in the house any items that did not sell.  Items remaining in the Burlington house after the tag sale included boxes of Kevin's personal items in the recreation room, some of Mr. Bowers' personal items, and Lonny's bedroom furniture which he later picked up.  Games and perhaps some clothes were left in the garage.  The shed also contained boxes of Mr. Bowers' clothes.  The record does not establish that any furniture was moved into the Burlington house at any time from mid-July of 1989 through its ultimate sale in December of 1989, although some of Mr. Bowers' personal items from the condo may have been moved from the condo to the Burlington house in that period.

On July 12, 1989, in Florida, Deborah signed an instrument establishing a Grantor Trust for Deborah Bowers (the Trust).  Brian C. Carey, petitioners' attorney in Connecticut, was appointed trustee.  Mr. Bowers was named as successor trustee, if Mr. Carey could not serve.

On or about July 25, 1989, petitioners placed $20,000 in escrow with Mr. Carey.  On July 26, 1989, Florence transferred title to the Burlington house by quitclaim deed to "Brian C.

Carey, Trustee" for the stated consideration of $20,000.[6]  This transfer was subject to the existing mortgages on the property, some of which mortgages were then in foreclosure proceedings. Out of the $20,000 placed in escrow, Florence herself received $14,223.60, $3,000 went to pay her bankruptcy attorney, and the remainder went to pay taxes and fees on the transaction.  At this time, the Burlington property was subject to three mortgages: the original 1978 first mortgage,[7] the March 21, 1980, mortgage from United Bank & Trust Co., and the March 23, 1989, mortgage from Connecticut National Bank.

On July 27, 1989, Mr. Bowers entered into a contract with Leaders Real Estate (Leaders) in Farmington, Connecticut, giving the realty company exclusive right to sell the Burlington property at a listed price of $279,900.  This contract was for the period of July 27, 1989, through August 27, 1989 (the first listing contract).  A second such contract was signed by Mr. Bowers on August 30, 1989, for the period of August 28, 1989, through September 28, 1989 (the second listing contract), with a listed price of $289,900.  Under the second listing contract, however, the parties agreed to allow an exclusion for a sale to Mr. and Mrs. Zbigniew Janas (the Janases).  Thus, if petitioners

---

[6] At that time, Florence thought that Mr. Carey was trustee for Mr. Bowers.

[7] At this time, the first mortgage, securing the loan from Hartford National Bank & Trust Co., was held by Shawmut Bank.

sold the Burlington property to the Janases, Leaders would not collect a commission.

On July 31, 1989, the Superior Court entered its Judgment of Foreclosure By Sale After Opening of Original Judgment, in favor of United Bank & Trust Co.[8] The Burlington property was to be sold at public auction on September 30, 1989, unless the amount due on the mortgage debt, plus interest and costs, was paid. On or about September 13, 1989, Mr. Carey received $32,500 from petitioners. On September 18, 1989, Mr. Carey paid United Bank and Trust Co. $32,376.89, thus forestalling the foreclosure sale. Mr. Carey's law firm was paid $123.11 with respect to the satisfaction of this mortgage.

On September 21, 1989, First Performance Mortgage Corp. sent a notice rejecting Mr. Bowers' application for a mortgage on the Burlington property. Petitioners had had an indication by late August that there were problems with the application and that the mortgage would not be granted. As will be discussed later, petitioners, on October 1, 1989, signed a contract to purchase the Jacksonville Golf and Country Club house.

After the second listing contract expired on September 28, 1989, petitioners advertised the Burlington property as for sale by owner. One such advertisement, placed in the Hartford Courant

---

[8] The parties in this action had appeared in Superior Court on Nov. 25, 1980, Jan. 11, 1984, and Jan. 30, 1989. The original judgment referred to is that of Jan. 11, 1984, for strict foreclosure.

on October 13, 1989, described the Burlington property as 3 acres offered for the price of $379,900[9] and listed the following telephone numbers: evening & weekends 904-292-9419; weekdays 904-363-0833. These phone numbers, respectively, are those of the Mandarin house and Mr. Bowers' business, Technical Acoustics, Inc., both located in Jacksonville, Florida.

On October 17, 1989, Mr. Carey paid $2,000 to Connecticut National Bank as good faith money to keep the bank from foreclosing on the Burlington house. This money was provided by petitioners.

On November 27, 1989, the Janases made a deposit in the amount of $10,000 on the purchase of the Burlington property. On December 8, 1989, Mr. Carey transferred title to the Burlington house to the Janases by warranty deed. The Janases purchased the Burlington property for $320,000. They also paid $750 to the settlement attorneys for settlement fees, title examination, and document preparation.

Proceeds from the sale of the Burlington property were used to pay off the mortgage held by Shawmut Bank in the amount of $67,598.56 and the mortgage held by Connecticut National Bank in the amount of $33,367.72. Settlement charges to the sellers (petitioners), consisting of recording fees and taxes, totaled

---

[9] This included all three lots comprising the Burlington property, whereas the property that had been offered for sale through Leaders had excluded one of those lots.

$2,037. The amount of $5,000 was paid to Mr. Carey's law firm as his fee for procuring the Burlington property, representing petitioners in the negotiations with the lenders, sale of the property, and preparation of documents. The remaining balance of $211,996.72 was paid to Deborah.

The Jacksonville Golf and Country Club Residence

On October 1, 1989, petitioners had signed a contract to purchase the house located at 13055 Sandwedge Court, Jacksonville, Florida, at the Jacksonville Golf and Country Club (the Jacksonville Golf house or property). The Jacksonville Golf house had four bedrooms, three bathrooms, a sauna, a fireplace, and a swimming pool; it was the model house for that development and thus was fully furnished. The purchase price was $368,000. On December 15, 1989, Deborah received title to the Jacksonville Golf property. Mr. Bowers is an entrepreneur involved in numerous business activities and has always made it a practice to title the family residence in his wife's name.

Petitioners had applied to the Barnett Bank of Jacksonville for a mortgage in the amount of $200,000 to purchase the Jacksonville Golf property. Mr. Bowers had met with the mortgage officer on October 10, 1989. The name of Mr. Bowers appears in the Borrower section of the application, and that of Deborah in the Co-Borrower section. The Mandarin house address was given as the present address for both petitioners, and the application stated that both had lived at that address for 9 months. The

Burlington house was listed as the former address for both petitioners, with Mr. Bowers' section stating he had lived at that address for 11 years.[10]  The telephone numbers given for Mr. Bowers were a home phone number of 292-9419 and a business phone number of 363-0833.  Those phone numbers were to the Mandarin house and Technical Acoustics, Inc., respectively.  Only a home phone number was listed for Deborah; that number was 292-9419.  Petitioners' assets as listed on the mortgage application included $6,347.10 deposited in Barnett Bank of Jacksonville and $5,588.34 in Enterprise National Bank of Jacksonville.  Petitioners listed no other bank accounts.  Petitioners indicated that they intended to occupy the Jacksonville Golf house as their primary residence.  Petitioners moved into the Jacksonville Golf house on December 15, 1989.

Homestead Exemptions

Florida residents are eligible for an exemption from Florida property tax of $25,000 of the assessed value of their homes.  Petitioners did not file an application for the homestead exemption for the Mandarin house for 1989.  For 1990 petitioners filed applications for homestead exemptions for both the Mandarin house and the Jacksonville Golf house.  Mr. Bowers completed the application for the Mandarin house exemption, which was dated

_____

[10] The number of years given for Deborah's length of residence at the Burlington house is illegible on the copy in evidence.

February 27, 1990, giving the Mandarin house address as his last year's (1989) address.  He indicated he had a Florida driver's license issued March 16, 1989.  The Jacksonville Golf house application, also dated February 27, 1990, was in Deborah's name. It listed her last year's (1989) address merely as "5050 Old Savannah Road", with no town or state.[11]  In the space for a Florida driver's license, a number appears for Deborah, but the date of issue was left blank.[12]

Business Activities of Mr. Bowers in 1989

Mr. Bowers had an interest in, or was involved with, the following businesses in 1989:  Bozak Manufacturers (Bozak), Tidon Industries, DB Associates, Sound Ideas, World Class Boxing, and Technical Acoustics, Inc.  Bozak, an electronic audio equipment manufacturer, was located in New Britain, Connecticut.  Tidon Industries was a window company located in the same building as Bozak.  DB Associates, a holding company, owned this building until some point during or around the year in issue.

Sound Ideas was a retail store in Newington, Connecticut, which sold consumer electronics.  Mr. Bowers and his brother, William Bowers (Bill), each owned half of this company, but Bill ran the business.  Mr. Bowers used the office at Sound Ideas to

---

[11] Deborah's parents' address was 50_32_ (formerly 5050) Old Savannah Road, Augusta, Georgia.

[12] Deborah testified that she believed she had a Georgia driver's license in 1989.  She did not have a Connecticut driver's license.

run his other businesses. He was there intermittently, going back and forth between Connecticut and Florida. Mr. Bowers received mail and had an answering machine there.

World Class Boxing had its base of operations in Connecticut. Mr. Bowers served as a manager of fighters and did some promotions. Previously, Mr. Bowers had been involved with Marlon Starling Enterprises, another fight concern. George Cruz trained fighters for Marlon Starling Enterprises and for World Class Boxing. Mr. Cruz often would contact Mr. Bowers through Sound Ideas, because if Mr. Bowers were not there, someone at Sound Ideas would know where to reach him.

The only business that Mr. Bowers received any income from in 1989 was Technical Acoustics, Inc. (TAI). TAI assembled equipment for sound reinforcement and telecommunication. Mr. Bowers was the sole owner of TAI, and he moved TAI from Connecticut to Jacksonville, Florida, during late December of 1988 or early January of 1989. The three TAI employees relocated as well. The same moving company moved TAI, Mr. Bowers, and his three employees. The items Mr. Bowers shipped to Florida consisted mostly of clothes contained in several wardrobe boxes and one bedroom set from the condo. That bedroom set went to the Mandarin house, which was purchased in late January of 1989 shortly after the TAI relocation to Florida.

By mid-February 1989, TAI had opened a checking account with Enterprise National Bank of Jacksonville, Florida. TAI used a

payroll processing service, and around the same time, TAI changed services and began to draw its paychecks on this new checking account. Prior to this, TAI had used a payroll service based in Connecticut, and the paychecks had been drawn on Northwest Bank for Savings, Avon, Connecticut.

TAI used independent contractors operating under the name of Robert Christopher Sales (RCS) to do its marketing; RCS served as TAI's manufacturer representatives. RCS was located in the New England area. Mr. Bowers would meet with the RCS principals both in Florida and in New England.

Sheldon Glick, an engineer, was in charge of all technical aspects of the business and ran TAI in Mr. Bowers' absence. Occasionally, he would call Mr. Bowers in Connecticut.[13] Petitioners did not submit into evidence copies of any phone bills to establish when or if calls were ever made to or from the Burlington house.

Checking Accounts

During 1989, petitioners had a joint checking account (#10004262) with Enterprise National Bank of Jacksonville, Florida (the Enterprise account). Petitioners opened the Enterprise account on January 25, 1989, under the names of Donald D. Bowers and Deborah Ann Scavone. The checks for the Enterprise

---

[13] Mr. Glick had the phone number to the Burlington house programmed into the speed dial function on his phone because that number was unlisted, and, if he forgot the number, he would not have been able to get it from information.

account were imprinted with the Mandarin house address.  At
first, the checks had only Mr. Bowers' name on them; later,
Deborah's name was added.  Bank statements dated from February
through May of 1989 were sent to "Donald D Bowers" and "Deborah
Ann Scavone" at 8933 Western Way, Suite 20, Jacksonville,
Florida, the address for TAI.  Beginning with the June 14, 1989,
statement, statements were sent to "Donald D Bowers" and "Deborah
Ann Bowers" at the Mandarin house address.  Mr. Bowers deposited
his TAI paychecks into this account.

    During the period February 6, 1989, through December 8,
1989, petitioners withdrew cash from the Enterprise account
through the use of automated teller machines (ATM's) on 81
occasions.  Of these, 79 withdrawals were from ATM's located in
Jacksonville, Florida, with the 2 remaining withdrawals occurring
at ATM's in Yulee, Florida.

    By October of 1989, Mr. Bowers had opened a second checking
account (#50001100) at Enterprise National Bank.  The checks were
imprinted with the Mandarin house address and Mr. Bowers' name.
Also by October of 1989, petitioners had opened a joint checking
account with Barnett Bank of Jacksonville, Florida.  These checks
were imprinted with the Mandarin house address and the names of
both petitioners.

    The record contains no evidence of personal bank accounts in
Connecticut, other than the reference to Federal Savings Bank on

Mr. Bowers' mortgage application for the purchase of the Mandarin house.

Mr. Bowers' Children

During 1989, Mr. Bowers' oldest son, Lonny, attended college; he lived in the condo for awhile. In the spring or early summer of 1989, Lonny moved to West Palm Beach, Florida, and began working for the GAP. Mr. Bowers' middle son, Kevin, who was then 16 years old, lived in the Burlington house with Florence until April of 1989. At that time, Florence took Kevin to the airport to go to Florida to live with Mr. Bowers. However, if Kevin went to Florida at that time, he shortly returned to Connecticut. Kevin spent most of the next few months living with his uncle, Bill, in Newington, Connecticut. In the fall of 1989, Kevin went to live with Deborah's parents in Augusta, Georgia. Mr. Bowers' youngest son, Duane, lived with Florence throughout 1989. Lonny was the only one of Mr. Bowers' three children who visited the Burlington house at any time after Florence quitclaimed it to the Trust on July 26, 1989.

Leaders Real Estate

Leaders was the realtor with which Mr. Bowers signed the two listing contracts on the Burlington Property described above. Leaders had the following telephone numbers at which to contact petitioners: 904-363-0833 (office), 904-292-9419 (home), and

904-363-0848 (fax).[14]   The office and fax numbers belong to TAI; the home number is that of the Mandarin house.  Both the first and second listing contracts were faxed to Mr. Bowers in Florida. The second listing contract was returned to Leaders by fax on August 30, 1989, from TAI.  Leaders tried unsuccessfully to extend the listing beyond September 28, 1989, and sent correspondence to Mr. Bowers at the TAI fax number on October 9, 1989, and on October 10, 1989.

Leaders prepared an appointment sheet for each property that it listed, on which it would record each time the property was shown by any real estate agent.  The showing instructions on the appointment sheet for the Burlington house read "vacant lock box".  It was Leaders' practice to have its agents meet and tour each newly listed property on the Tuesday following receipt of the listing.

Barbara Brenneman (Ms. Brenneman) is a 50-percent owner of Leaders and a licensed realtor in the State of Connecticut.  Ms. Brenneman personally showed the Burlington property to potential buyers on three occasions during August and September 1989. Also, whenever she was in the neighborhood, she would enter the Burlington house to check on it.[15]  On one occasion, she let a

---

[14] The designations specified within the parentheses were made by Barbara Brenneman, a 50-percent owner of Leaders.

[15] It was Leaders' practice to check on the vacant listed properties to make sure the properties were secure, that no

(continued...)

repairman into the house. Ms. Brenneman observed some sports equipment in one room of the Burlington house but saw no furniture. She saw some items in the garage and the shed. She noted that the property needed some repairs. Prior to trial, Ms. Brenneman had never met Mr. Bowers personally.[16]

Repairs to the Burlington House

Allen Wilcox (Mr. Wilcox) is a building contractor who performed repairs to the chimney and roof of the Burlington house.[17] Mr. Wilcox first visited the Burlington house in August of 1989 and, on August 22, 1989, prepared a proposal for the repair needed on the chimney. No one was there when Mr. Wilcox made his initial visit to the Burlington house. He sent his proposal to Mr. Bowers in Florida. On August 30, 1989, Mr. Bowers accepted the proposal and wrote a check to Mr. Wilcox in the amount of $800 as a deposit for the work to be done.

In early September after receiving Mr. Bowers' deposit, Mr. Wilcox and his son performed the requested repairs. No one was present at the Burlington house, and the water supply to the outside faucets was turned off. Mr. Wilcox contacted a real

---

[15](...continued) unauthorized persons had entered and damaged the properties, and that the lights were turned off.

[16] Mickey Wilcox was the listing agent. He showed the Burlington house six times between July 27, 1989, and Aug. 5, 1989. Mickey Wilcox did not testify at the trial.

[17] Allen Wilcox is Mickey Wilcox's uncle.

estate agent to unlock the house in order to turn on the water, which was needed to mix the mortar for the chimney. The only furniture Mr. Wilcox saw in the main living areas was a kitchen table.[18] On September 18, 1989, a bill was prepared reflecting the work performed on the chimney and roof, with a balance due of $767. This bill was sent to Mr. Bowers at TAI's address in Florida. A second notice was sent on October 18, 1989. On November 3, 1989, Mr. Wilcox returned to the Burlington house to apply silicon to the chimney. The only people that Mr. Wilcox saw during his visits to the Burlington property (other than his son) were the real estate agent mentioned above and Mr. Janas.[19]

Mr. Wilcox's telephone bill lists the following calls to Jacksonville, Florida:

| Date | Time | Length of Call | Phone Number |
|------|------|------|------|
| Aug. 29, 1989 | 7:54 PM | 8 minutes | 904-292-9419[1] |
| Oct. 18, 1989 | 9:53 AM | 1 minute | 904-363-0833[2] |
| Nov. 1, 1989 | 4:31 PM | 5 minutes | 904-363-0833 |

[1] This is the phone number to the Mandarin house.
[2] This is the phone number to TAI.

---

[18] He did not go into the basement or bedrooms.

[19] On Nov. 13, 1989, Mr. Wilcox sent a bill to Mr. Bowers at the TAI address showing a previous balance of $767, a charge of $85 for the recent silicon work, and a new balance of $852. Subsequent bills for this balance were sent on Dec. 1, 1989, Dec. 19, 1989, and Jan. 15, 1990. Mr. Wilcox was never paid the balance owed.

From August 30, 1989, through October of 1989, petitioners paid $4,650 for repairs to the Burlington house, including the $800 deposit towards the repair of the chimney. Some of the amount paid was for repair of the decks. These expenses were paid by checks drawn on the Florida checking accounts mentioned above.

Occupancy of the Burlington House

Mr. Bowers never lived in the Burlington house on a regular day-to-day basis at any time after he separated from Florence in early October of 1987. Deborah never lived in the Burlington house on a regular day-to-day basis.

Any time Mr. Bowers and Deborah spent at the Burlington house in 1989 occurred between mid-July of 1989, when Florence moved out of the house, and late August or early September, when they learned Mr. Bowers' mortgage application would be rejected. At that time, if not earlier, they began to look for a house in Jacksonville, Florida, in a gated community on a golf course. They signed the purchase contract on the Jacksonville Golf house on October 1, 1989. Any time petitioners spent at the Burlington house in 1989 amounted to no more than a few days on a sporadic and intermittent basis.[20]

_____

[20] The Court did not believe petitioners' testimony that they actually moved into the Burlington house and made it their home in 1989. The testimony of other witnesses, even that of Mr. Bowers' brother, was too vague and uncertain as to time frame to be helpful. Most of those witnesses could not even say when TAI
(continued...)

Tax Return

Petitioners requested and received approval of their Application for Additional Extension of Time To File their 1989 Federal income tax return until October 15, 1990. The dates appearing next to petitioners' signatures on the return are both November 4, 1990. The Internal Revenue Service (IRS) received the return on November 13, 1990.

Petitioners reported an adjusted gross income of $32,856, which consisted of Mr. Bowers' wages from TAI of $27,600, Schedule E income from TAI of $4,929, and $327 from Deborah's modeling. Petitioners reported no income from any of Mr. Bowers' other business interests. Mr. Bowers' Form W-2 from TAI shows his address as that of the Mandarin house.

Petitioners completed Form 2119 (Sale of Your Home) and attached it to their return. On this form, petitioners reported the sale of the Burlington property for $320,000, an adjusted basis in that property of $182,634, and a gain of $137,366. Petitioners did not indicate any fixing-up expenses on the Burlington house, nor any selling expenses. They reported the cost of a new residence as $370,273.

The IRS examined petitioners' return and disallowed the deferral of gain from the sale of the Burlington property on the ground that petitioners had not shown that they used the

[20](...continued)
moved to Florida, let alone Mr. Bowers.

Burlington house as their principal residence.  On October 14, 1993, respondent issued the notice of deficiency.  Through amended pleadings, respondent alleged that petitioners' basis in the Burlington property was $160,030, not $182,634 as stated on the return, and asserted corresponding increases in the deficiency, addition to tax, and accuracy-related penalty. Petitioners allege that their basis in the Burlington house was greater than the amount claimed on their return.

## ULTIMATE FINDINGS OF FACT

1.  The Burlington house was not the principal residence of either petitioner in 1989.

2.  The gain in the amount determined below must be recognized in 1989.

3.  Petitioners' 1989 tax return was not timely filed, and they are liable for the delinquency addition.

4.  Petitioners were negligent and disregarded rules or regulations in claiming deferral of the gain on the sale of the Burlington house.

## OPINION

Generally, sections 1001 and 61 require a taxpayer to recognize gain realized on the sale of property in the year of the sale.  Section 1034, however, requires a taxpayer to defer recognition of gain realized on the sale of the taxpayer's principal residence in certain circumstances.  If the taxpayer purchases and uses a new principal residence within the specified

replacement period,[21] the taxpayer will recognize gain on the sale only to the extent that the taxpayer's adjusted sales price[22] of the old residence exceeds the taxpayer's cost of purchasing the new residence. Sec. 1034(a). Thus, if the cost of the new residence equals or exceeds the adjusted sales price of the old residence, the entire gain will be deferred. If the cost of the new residence is less than the adjusted sales price of the old residence, gain will be recognized to the extent of the difference. Sec. 1.1034-1(a), Income Tax Regs. The deferral of the gain is accomplished by reducing the basis of the new residence by the amount of gain not recognized on the sale of the old residence. Sec. 1034(e).

The Burlington House as Principal Residence

Whether a residence is used by a taxpayer as his or her principal residence depends on all the facts and circumstances of each case. Thomas v. Commissioner, 92 T.C. 206, 242-243 (1989); sec. 1.1034-1(c)(3)(i), Income Tax Regs. Property is used by a taxpayer as a residence if that taxpayer physically occupies or lives in that property. United States v. Sheahan, 323 F.2d 383, 386 (5th Cir. 1963); Bayley v. Commissioner, 35 T.C. 288, 295

---

[21] The replacement period begins 2 years before and ends 2 years after the date of the sale of the old residence. Sec. 1034(a).

[22] The adjusted sale price is the amount realized (selling price minus selling expenses) reduced by any expenses of fixing up the old residence in order to assist in its sale. Sec. 1034(b).

(1960). The term "principal" means one's chief or main place of residence. Thomas v. Commissioner, supra at 243; Stolk v. Commissioner, 40 T.C. 345, 356 (1963), affd. 326 F.2d 760 (2d Cir. 1964). In other words, the phrase "used by the taxpayer as his principal residence" means "habitual use of the old residence as the principal residence". Stolk v. Commissioner, supra, at 355.

The record clearly establishes petitioners' ties to and presence in Florida throughout most of 1989. This evidence includes: The purchase of the Mandarin house in Florida; the relocation of TAI to Florida; the checking accounts in Florida; the frequent ATM withdrawals in Florida; the Leaders appointment sheet showing the Burlington house as vacant; the testimony of Ms. Brenneman and Mr. Wilcox that the Burlington house was empty and that their only contacts with petitioners were through phone numbers or addresses in Florida; and the sales contract and mortgage application for the Jacksonville Golf house.

Deborah never lived in the Burlington house on a regular basis; Mr. Bowers never lived there on a regular basis after he separated from Florence in October of 1987. In 1989 petitioners physically occupied or lived in the Connecticut condo or the Mandarin house most of the time.[23] They signed the purchase contract for the Jacksonville Golf house on October 1, 1989, and

---

[23] Deborah spent one-third to one-half of her time with her parents in Augusta, Georgia.

occupied that house on December 15, 1989.  Florence continued to live in the Burlington house until mid-July of 1989, and any time that petitioners spent in the Burlington house occurred between mid-July and late August or early September of 1989.  The record as a whole convinces the Court that any occupancy of the Burlington house by petitioners was at most just a few days on a sporadic and intermittent basis.  See supra note 20.

Petitioners testified in an attempt to rebut such evidence and to try to establish their use of the Burlington house. Petitioners presented no witnesses or documentary evidence to corroborate their self-serving testimony.  They alleged the Mandarin house was purchased and used for business purposes.  We found their testimony to be vague, inconsistent, and generally not credible.  We are not required to accept such testimony. Potito v. Commissioner, 534 F.2d 49, 51 (5th Cir. 1976), affg. T.C. Memo. 1975-187; Tokarski v. Commissioner, 87 T.C. 74, 77 (1986).  See supra note 20.

Based on all the facts and circumstances, we find that the Burlington house was not used by either petitioner as a principal residence after October of 1987.[24]  Therefore, section 1034 does not apply to the sale of the Burlington house, and petitioners must recognize the gain from that sale in 1989.

---

[24] Since we reach this conclusion, we need not address respondent's argument that only Deborah's principal residence is at issue because Mr. Bowers had no legal or equitable title to the Burlington property while the Trust had record title.

Gain on the Sale of the Burlington Property

The gain from the sale of property shall be the excess of the amount realized over the adjusted basis. Sec. 1001(a). The adjusted basis for determining gain or loss from the sale of property is the basis (cost) of such property, adjusted as provided in section 1016. Secs. 1011, 1012. Section 1016 adjustments to basis pertinent to the basis of a personal residence include increases due to capital expenditures, and reductions due to nonrecognition of gain on a previous residence under section 1034(e). Sec. 1016(a).

Petitioners (or the Trust) sold the Burlington property to the Janases for $320,000. Out of that amount, petitioners paid $2,037 in closing costs. Although petitioners placed at least one advertisement in the Hartford Courant in connection with the sale, the record does not establish the cost petitioners incurred, and we decline to speculate. Petitioners have alleged they spent a total of $24,443 for repairs performed and carpeting installed while the Trust held the Burlington property. Most of those claimed expenditures were wholly unsubstantiated. Respondent allowed $4,650 for repairs in recalculating petitioners' increased deficiency. We have no evidence to establish any greater amount for repairs or other selling expenses in connection with the sale of the Burlington house.

Petitioners paid Mr. Carey a total of $5,123.11 for his legal services related to acquisition of the Burlington property.

Some of this expense was related to acquisition of the Burlington property from Florence, and some was related to its sale. While fees incurred in the acquisition of property are part of basis, and those incurred during sale are a reduction in the amount realized, either treatment reduces the amount of petitioners' gain.

Petitioners paid $20,000 in cash, plus releasing Florence from the mortgage obligations, in consideration for Florence's transferring title to the Trust. On July 26, 1989, when Florence transferred title, the Burlington property was subject to the three outstanding mortgages. The record is silent as to the exact amount of these debts on that date. However, petitioners later made the following payments on these mortgages:

| Date | Amount | Lender |
|------|--------|--------|
| Sept. 18, 1989 | $32,376.89 | United Bank & Trust Co. |
| Oct. 17, 1989 | 2,000.00 | Connecticut National Bank |
| Dec. 8, 1989 | 67,598.56 | Shawmut Bank |
| Dec. 8, 1989 | 33,367.72 | Connecticut National Bank |
| | $135,343.17 | |

These payments were a cost of acquisition as discussed below.

Petitioners argue that their basis in the Burlington property should include $50,000 for the mortgage from Florence to Mr. Bowers that was released. This debt was voided by the Bankruptcy Court on July 6, 1987, as well as ordered released by the Superior Court on January 31, 1989. See supra notes 2, 3. Mr. Bowers' inability to collect on this purported debt is not a

cost incurred in acquiring the Burlington property or a capital expenditure; therefore, it cannot be included.

Petitioners also argue that Mr. Bowers had a carryover basis of $182,531,[25] or, alternatively, that Deborah received a gift from Mr. Bowers with a carryover basis of $91,265. This, petitioners argue, is in addition to the other items of basis already mentioned, except to the extent that a portion of the first mortgage would be double-counted. The former argument is the equivalent of saying that Mr. Bowers had a 100-percent interest in the Burlington property just prior to Florence's transferring title, that he is entitled to 100 percent of the alleged carryover basis in the Burlington property at that time, and that he continued to have an interest after Mr. Carey acquired title for the Trust. The alternative argument is similar, except that Mr. Bowers purportedly gave a one-half interest of the alleged carryover basis to Deborah.

Respondent's position is that there is no carryover basis from Mr. Bowers. Respondent argues that Mr. Bowers did not have

---

[25] Petitioners on brief calculated this carryover basis as follows:

|  |  |
| --- | --- |
| Original purchase price | $125,000 |
| New well system | 40,000 |
| Original landscaping | 7,500 |
| Initial improvements | 10,031 |
| Total | $182,531 |

The evidence of record does not support these figures.

an ownership interest, legal or equitable, in the Burlington property after Mr. Carey received title, and any equitable interest that Mr. Bowers may have had pursuant to the modified divorce judgment was extinguished at the time Florence sold the Burlington property to the Trust.

Under Connecticut State law, neither the husband nor the wife acquires, by virtue of the marriage, any interest in the real or personal property of the other during the other's lifetime.  Conn. Gen. Stat. Ann. sec. 46b-36 (West 1995); Tobey v. Tobey, 165 Conn. 742, 748, 345 A.2d 21, 25 (1974).  If the purchase price is paid by one spouse and the conveyance is taken in the name of the other, there is a presumption that a gift to the other spouse is intended.  Whitney v. Whitney, 171 Conn. 23, 33, 368 A.2d 96, 102 (1976) (citing Walter v. Home National Bank & Trust Co., 148 Conn. 635, 638, 173 A.2d 503, 505 (1961)).  However, at the time of entering a divorce decree, "the superior court may assign to either the husband or wife all or any part of the estate of the other.  The court may pass title to real property to either party or to a third person or may order the sale of such real property * * *. "  Conn. Gen. Stat. Ann. sec. 46b-81 (West 1995).

From November 10, 1978, until July 26, 1989, Florence held legal title to the Burlington property in her name alone.  However, the April 15, 1988, divorce judgment provided that the Burlington property would be sold at a future date, and the

equity divided equally upon that sale. The November 29, 1988, modification to the divorce judgment provided that Florence would sell the Burlington property and that Mr. Bowers would receive 25 percent of the net proceeds and Florence 75 percent. Thus, as of November 29, 1988, Mr. Bowers had no more than a 25-percent interest in the Burlington property. Bachyrycz v. Gateway Bank, 30 Conn. App. 52, 618 A.2d 1371 (1993).

Petitioners chose to have Florence transfer title to the Trust. They elected to style the Trust as one for the benefit of Deborah, not for Mr. Bowers or for themselves jointly. By doing so, they caused Mr. Bowers' equitable interest to be extinguished upon the transfer of title to the Trust. In essence, Florence transferred both her 75-percent interest and Mr. Bowers' 25-percent interest to the Trust for the benefit of Deborah. The transfer to the Trust can be viewed as part gift and part sale. Mr. Bowers received no cash, but realized (was relieved of) 25 percent of the liabilities to which the property was subject at the time of transfer to the Trust.

> Where a transfer of property is in part a sale and in part a gift, the unadjusted basis of the property in the hands of the transferee is the sum of--
>
>     (1) Whichever of the following is the greater:
>       (i) The amount paid by the transferee for the property, or
>       (ii) The transferor's adjusted basis for the property at the time of the transfer, and
>     (2) The amount of increase, if any, in basis authorized by section 1015(d) for gift tax paid * * *.

Sec. 1.1015-4(a), Income Tax Regs.

The amount paid by the Trust for Mr. Bowers' interest was 25 percent of the liabilities, or $33,835.79 (25 percent of $135,343.17).  Mr. Bowers' basis as transferor was 25 percent of the basis of the Burlington property when Florence transferred title.  Based on the record, we find that the basis of the Burlington property at that time was $122,000, the original purchase price of Mr. Bowers and Florence in 1978.  Accordingly, Mr. Bowers' basis would have been $30,500 (25 percent of $122,000).  The greater of these is $33,835.79.  No gift tax was paid.  Accordingly, the Trust's basis in the 25 percent transferred from Mr. Bowers was $33,835.79.  The cost of acquiring Florence's 75-percent interest was $121,507.38 ($20,000 paid in cash plus $101,507.37 (75 percent) of the liabilities).

To summarize, the following items are to be used in calculating petitioners' gain on the sale of the Burlington property:

| | | |
|---|---:|---:|
| Consideration received | $320,000 | |
| Closing costs | | $2,037.00 |
| Repairs or selling expenses | | 4,650.00 |
| Attorney fees | | 5,123.11 |
| Basis in interest from Mr. Bowers[1] | | 33,835.79 |
| Basis in interest from Florence[1] | | 121,507.38 |
| | $320,000 | $167,153.28 |

[1] Rather than the part gift-part sale analysis above, the Court would reach the same result from the fact that the Trust paid $20,000 to Florence plus assuming liabilities of $135,343.17 for the property for a total basis of $155,343.17.

Accordingly, the gain which petitioners must recognize in 1989 is $152,846.72 ($320,000 minus $167,153.28).

Addition to Tax Under Section 6651(a)(1)

Section 6651(a)(1) imposes an addition to tax for failure to file a return on the date prescribed (determined with regard to any extension of time for filing), unless it is shown that such failure is due to reasonable cause and not due to willful neglect. The taxpayer has the burden of proof to show the addition is improper. United States v. Boyle, 469 U.S. 241, 245 (1985); Funk v. Commissioner, 687 F.2d 264, 266 (8th Cir. 1982), affg. T.C. Memo. 1981-506.

Petitioners received approval of their Application for Additional Extension of Time To File until October 15, 1990. Their signatures on the Form 1040 were dated November 4, 1990; their 1989 return was received by the IRS on November 13, 1990. Petitioners did not include this issue in their trial memorandum, did not offer any evidence on the issue at trial, nor address it in their briefs. Their return was not timely filed, and we consider petitioners to have conceded their liability for the delinquency addition.[26]

Accuracy-related Penalty Under Section 6662

Section 6662 imposes a penalty of 20 percent on any portion of an underpayment of tax attributable to negligence or disregard of

---

[26] Petitioners pleaded the statute of limitations as a defense to the deficiency and additions, alleging that the notice of deficiency, mailed Oct. 14, 1993, was issued more than 3 years after the return was filed. The facts show that the return was not filed until Nov. 13, 1990, and hence the notice of deficiency was timely issued. We similarly consider petitioners to have conceded this issue.

rules or regulations.  Sec. 6662(a) and (b)(1).  Negligence is the lack of due care or the failure to do what a reasonable and prudent person would do under the circumstances.  <u>Neely v. Commissioner</u>, 85 T.C. 934, 947 (1985).  Negligence includes any failure to make a reasonable attempt to comply with the provisions of the Internal Revenue Code, and disregard includes any careless, reckless, or intentional disregard.  Sec. 6662(c).  No penalty shall be imposed with respect to any portion of an underpayment if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion.  Sec. 6664(c)(1).

Petitioners were negligent in claiming that the Burlington house was their principal residence and attempting to defer the gain on its sale.  They have failed to provide any evidence that they acted in good faith or had reasonable cause for claiming the Burlington house as their principal residence in 1989.  See <u>supra</u> note 20.  Thus, we hold for respondent on this issue.

In keeping with the above holdings,

<u>Decision will be entered</u>

<u>under Rule 155.</u>