T.C. Memo. 1998-82

UNITED STATES TAX COURT

TERRY DUANE BEALL AND JOYCE ENGEL BEALL, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 18922-94.                    Filed February 25, 1998.

<u>Paul Martin Shimoff</u>, for petitioners.

<u>Jonathan H. Moss</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

WRIGHT, <u>Judge</u>:  Respondent determined an income tax
deficiency for petitioners' 1989 taxable year in the amount of
$140,882.  Respondent also determined an accuracy-related penalty
for negligence under section 6662(a)[1] in the amount of $28,182.

---

[1]  All section references are to the Internal Revenue Code
(continued...)

The issues for decision are (1) whether petitioners are entitled to roll over the gain on the sale of their residence under section 1034, and (2) whether petitioners are liable for the accuracy-related penalty for negligence.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners resided in Coronado, California, when the petition was filed.

Background

Petitioners Terry Duane Beall (Terry) and Joyce Engel Beall (Joyce) are husband and wife. They were married in 1954. In 1959, petitioners moved to Riverside, California. They had two children: Marc, born in November 1955, and Julie, born in July 1957. Both children attended high school in Riverside. As of 1980, neither child lived at home with petitioners.

Business

Since 1955, Terry has worked in the insurance business. From 1959 to 1964, he worked at Beall, Hughes & Associates, in Riverside, which specialized in selling life insurance to

---

[1](...continued)
in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

military personnel. After 1964, he continued to work in the insurance industry for various insurance companies.

In 1971, Terry purchased an office building on Alessandro Boulevard (Alessandro office) in Riverside. This office building was not sold until November 22, 1991. From this office he primarily sold insurance to members of the Non-Commissioned Officers Association (NCOA). NCOA was affiliated with Academy Life Insurance, Inc. (Academy). Terry, as an independent agent, became a managing general agent on behalf of Academy in 1971. In this position he sold life insurance to military personnel in 17 Western States.

In 1972, Terry, as the sole shareholder, organized the New Dawn Corp. Later, the articles of incorporation were amended, changing the name to Terry Beall, Inc. (Corporation). The Corporation's primary business purpose was to sell life insurance to military personnel. Petitioners were the Corporation's only employees during 1987 and 1988. Joyce was the Corporation's secretary. Her services included entertainment activities, such as picking up people at airports, helping plan dinners, etc.

During the 1970's, the Corporation's business began to expand throughout California. As its presence grew in the San Diego area, the Corporation purchased properties known as 30 The Point and 20 The Point. The business also expanded outside

California to such places as Idaho and Hawaii and eventually expanded on an international level.

On December 31, 1986, Terry entered into an agreement with Academy for the sale of his clients' names, records, and accounts, including the managing general agent's agreements. At the same time, he entered into a 5-year employment contract with Academy, commencing on January 1, 1987, to be Academy's executive vice president--marketing and the chairman of the board of Academy Services, Inc. During Terry's employment term, Academy could not require him to relocate. In light of Academy's business interests around the world, Terry's job focused on clients in and outside California. As a result, he traveled outside California regularly.

On August 1, 1988, the Corporation was liquidated, and Terry made a section 333 election. Before the Corporation was liquidated, petitioners held a meeting with their tax attorney and accountant.

Mary Street

In 1973, petitioners purchased property at 2320 Mary Street (Mary Street) in Riverside, California from Joyce's parents. Mary Street had been Joyce's family home. Petitioners moved into Mary Street, and they raised their children there from 1973 until 1980.

Mary Street was located on approximately 3.4 acres. It had a 2,700-square-foot residence consisting of three bedrooms and a separate residence for the caretaker and his spouse. It also had a citrus grove with approximately 350 citrus trees. Petitioners maintained a citrus grove business on the property.

For the years 1973 through 1988, petitioners received a homeowners' exemption on Mary Street.

On March 29, 1993, petitioners sold Mary Street. Before to that date, petitioners purchased another residence at 6199 Hawarden Drive in Riverside. Before the sale of Mary Street, petitioners never rented out the property.

30 The Point

The Corporation owned a one-half interest in 30 The Point, Coronado, California (30 The Point), with petitioners holding the other one-half interest. The Corporation used 30 The Point for business purposes, such as office space, as a place to entertain clients, and as an alternative to hotel rooms for the Corporations's employees while they were in the San Diego area. In February 1985, the Corporation sold its interest in 30 The Point.

20 The Point

On April 28, 1983, the Corporation purchased a residence located at 20 The Point, Coronado, California (20 The Point). The Corporation purchased 20 The Point fully furnished.

20 The Point was a 3,200-square-foot home, with four bedrooms and two master bedroom suites, on the Coronado Cays waterfront with a 40-foot dock. As with 30 The Point, 20 The Point was used by the Corporation as a business asset. The Corporation took depreciation deductions on the property for the period April 27, 1983, to July 31, 1988. 20 The Point was used as an office for the Corporation. Additionally, it was used as an alternative to hotel rooms for the Corporation's employees and agents, and as a place to entertain clients. From its own dock, the Corporation took clients out on the bay.

When the Corporation was liquidated in August of 1988, petitioners received 20 The Point. The deed conveying 20 The Point to them was dated August 31, 1988, and recorded on September 23, 1988.

Petitioners continued to have an office at 20 The Point after the liquidation.

On September 28, 1988, petitioners listed 20 The Point for sale. On December 30, 1988, petitioners entered into a Real Estate Purchase Contract and Receipt for Deposit for the sale of 20 The Point. On March 9, 1989, the sale of 20 The Point was closed.

For the years 1988 and 1989, petitioners did not apply for a homeowners' exemption on 20 The Point. Petitioners never

reported 20 The Point as their mailing address to the California Department of Motor Vehicles.

15 Sandpiper

15 Sandpiper Strand (15 Sandpiper) is located in Coronado, across the channel from 30 The Point and 20 The Point. 15 Sandpiper is a 4,000-square-foot waterfront house with four bedrooms, three and a half baths, and a 100-foot dock.

After admiring the residence, Terry approached the owner of 15 Sandpiper about the property, requesting that he be notified if the property became available for sale. On September 26, 1988, petitioners became aware of the availability of 15 Sandpiper. At that time, Terry was in Washington, D.C., and he flew back to California immediately and on September 27 negotiated the purchase of 15 Sandpiper. The next day petitioners listed 20 The Point for sale. On October 3, 1988, petitioners executed a Real Estate Purchase Contract and Receipt for Deposit with respect to the purchase of 15 Sandpiper. On this document petitioners listed Mary Street as their address. Because of a prior tax sale in 1988 and difficulties in obtaining title insurance, an agreement was entered on November 18, 1988, so that full defeasible title of 15 Sandpiper could be conveyed to petitioners as trustees of the Beall Family Trust. The escrow on 15 Sandpiper closed on November 21, 1988. The purchase price

for 15 Sandpiper was $950,000, and the home was purchased fully furnished for an additional $250,000.

On November 29, 1988, petitioners changed their voter registrations from Riverside County to San Diego County, listing 15 Sandpiper Strand as their new address. Upon the expiration of his driver's license on January 26, 1989, Terry changed the address of his residence to reflect 15 Sandpiper.

On March 1, 1989, petitioners hired a moving company to move their furnishings from 20 The Point to 15 Sandpiper.

In 1989, petitioners received a homeowners' exemption for 15 Sandpiper.

3 Green Turtle

Petitioners purchased a vacant lot located at 3 Green Turtle Road, Coronado, California (3 Green Turtle) on December 1, 1988. 3 Green Turtle is a residential lot located in Coronado Cays, within the same neighborhood as 20 The Point and 15 Sandpiper. Terry believed the lot to be "superior" because it was located on a main channel, with a "bigger dock space," and an "unobstructed view of Coronado Bridge."

1989 Federal Income Tax Return

On their 1989 Federal income tax return, petitioners reported the sale of 20 The Point. They executed a Form 2119, Sale of Your Home, with respect to 20 The Point. They attached this form to their return, thereby claiming the right to defer

under section 1034 a gain of $341,710 realized on the sale of 20 The Point based on the rollover to 15 Sandpiper. Later, the correct amount of deferred gain on the sale of 20 The Point was determined to be $503,250.

Petitioners' 1989 Federal income tax return was prepared by Robert McKenzie, who had been their accountant for more than 30 years. He maintains his office in San Bernardino, California. McKenzie had also been the Corporation's accountant since its incorporation in 1972.

Before the Corporation's liquidation, petitioners met with McKenzie in June 1988 to discuss it. Petitioners also met with McKenzie to discuss their 1989 tax return.

Activities

Between 1980 and 1989, petitioners were members of either Palm Baptist Church or Magnolia Avenue Baptist Church, located in Riverside. Petitioners also attended various churches from San Diego to Palm Springs, such as Skyline Wesleyan Church in San Diego.

Petitioners were members of Coronado Cays Yacht Club, located in Coronado, California, and Shrimers Pictoria Country Club, located in Riverside, California.

Petitioners continued to maintain bank accounts at Inland National Bank in Riverside during 1988, 1989, and 1990. Also, petitioners continued to receive mail at Mary Street after the

acquisition of 20 The Point.  Petitioners' 1988 Forms W-2 were mailed to petitioners at Mary Street.  Petitioners' 1989 and 1990 Forms W-2 were mailed to the Alessandro office.

In 1988, Marc and Julie both lived in Riverside.  At this time, Terry's mother lived in San Bernardino, California.

OPINION

Issue 1. Whether Petitioners Must Recognize Gain From the Sale of 20 The Point

As a general rule, gain realized from the sale or other disposition of property must be recognized.  Sec. 1001(c). Section 1034, which provides an exception to this general rule, allows a taxpayer to defer recognition of all or part of any gain realized on the sale of a principal residence (old residence) if other property is purchased and used by the taxpayer as a new principal residence (new residence) within the period beginning 2 years before the date of the sale and ending 2 years after that date (the replacement period).  Under section 1034(a), gain is recognized only to the extent that the "adjusted sales price", as defined in section 1034(b), of the old property exceeds the cost of purchasing the new property.

The primary issue is whether petitioners' realized gain on the sale of 20 The Point is entitled to the nonrecognition treatment of section 1034.  Respondent determined that section 1034(a) is inapplicable because 20 The Point was a business asset and was not used by petitioners as their principal residence.

Petitioners contend that they are entitled to roll over the $503,250 gain under section 1034. Petitioners bear the burden of showing their entitlement to the nonrecognition benefits of section 1034 by proving that they have satisfied all of the section's requirements. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933); Durando v. United States, 70 F.3d 548, 550 (9th Cir. 1995); see Boesel v. Commissioner, 65 T.C. 378, 386 (1975); see also Lokan v. Commissioner, T.C. Memo. 1979-380.

Petitioners sold 20 The Point, which they describe as their old residence, on March 9, 1989, realizing a gain of $503,250, purchased 15 Sandpiper, the new residence, on November 21, 1988, and then moved into 15 Sandpiper on March 1, 1989. This meets the replacement period of 2 years mandated in section 1034. Thus, we must decide the narrow question whether 20 The Point was petitioners' principal residence from August 31, 1988 (date of acquisition of legal title), until March 9, 1989 (date of sale), and, if so, whether 15 Sandpiper was then used by petitioners as their principal residence.

The phrase "principal residence" is not defined by the Code; however, section 1.1034-1(c)(3)(i), Income Tax Regs., provides that the determination of whether a property is used by a taxpayer as his principal residence "depends upon all the facts and circumstances in each case, including the good faith of the taxpayer." In Stolk v. Commissioner, 40 T.C. 345, 353, 355,

(1963), affd. 326 F.2d 760 (2d Cir. 1964), this Court stated that

>     The elements of residence are the <u>fact of abode</u> and the <u>intention of remaining</u>, and the concept of residence is made up of a <u>combination of acts and intention</u>. Neither bodily presence alone nor intention alone will suffice to create a residence. * * *

>     *     *     *     *     *     *     *

>     The phrase "used by the taxpayer as his principal residence" means habitual use of the old residence as the principal residence. [Emphasis added.]

The term "principal residence" means one's chief or main place of residence. <u>Id.</u> at 351. In general, the property sold must be the principal residence at the time it is sold. <u>Thomas v. Commissioner</u>, 92 T.C. 206, 243 (1989); <u>Aagaard v. Commissioner</u>, 56 T.C. 191, 202-203 (1971).

Moreover, where part of the old residence sold was used as the taxpayer's principal residence and part was used for business purposes,[2] only the portion of the gain allocable to the residential use is entitled to section 1034(a) nonrecognition. <u>Richards v. Commissioner</u>, T.C. Memo. 1993-422; <u>Beckwith v. Commissioner</u>, T.C. Memo. 1964-254; <u>Grace v. Commissioner</u>, T.C. Memo. 1961-252.

---

[2] Respondent argues that 20 The Point was a business asset and that petitioners never abandoned their business use at 20 The Point. Therefore, respondent contends that 20 The Point continued to be used as a business asset, and not as petitioners' principal residence. Because, as discussed later, we determine that 20 The Point was not petitioners' principal residence, we do not need to make an allocation of business and personal use at 20 The Point.

Intention of Remaining

Petitioners expressed their intention regarding 20 The Point. In June 1988, they told McKenzie of their intention to "live at 20 The Point more or less indefinitely." At trial, Terry stated that on the day of the Corporation's liquidation, petitioners' intention was to live at 20 The Point for the future. Petitioners preferred to be in the San Diego area as opposed to the Riverside area. The San Diego area's climate was smog free and cooler than the Riverside area's climate, which was smoggy and hot.

Respondent argues that petitioners always intended to purchase 15 Sandpiper, even before their acquisition of 20 The Point on August 31, 1988. We disagree. We find that on August 31, 1988, the date of acquisition of 20 The Point, through the Corporation's liquidation, petitioners intended to remain in Coronado at 20 The Point. This intent changed when 15 Sandpiper became available on September 26, 1988. At that time, petitioners began to negotiate for the purchase of 15 Sandpiper, listed 20 The Point for sale, and eventually on November 21, 1988, purchased 15 Sandpiper.

Respondent also argues that petitioners never intended to make 20 The Point or 15 Sandpiper their principal residence because they purchased 3 Green Turtle. We disagree. Respondent relies on a letter by McKenzie, which states that Terry "decided

he would like to build a house on the lot for his own residence", and for that reason it was suggested that title be changed from Terry's Retirement Trust to his living trust. This letter provides us with McKenzie's view of petitioners' intentions and with an explanation for the change in title. We note that petitioners purchased 3 Green Turtle, which was a vacant lot, 3 months after acquiring 20 The Point, and after the acquisition of 15 Sandpiper.

Considering the facts and circumstances, during the relevant period, we find that petitioners had the intent of remaining at 20 The Point from August 31, 1988, the date of acquisition, until November 21, 1988, when their purchase of 15 Sandpiper was completed.

Fact of Abode

Generally, for property to be "used by the taxpayer as his principal residence" within the meaning of section 1034(a), a taxpayer must physically occupy and live in the dwelling. Houlette v. Commissioner, 48 T.C. 350, 354 (1967); Stolk v. Commissioner, supra at 353-356. It has long been recognized that moving furniture into a house or spending weekends in a house does not make that house a taxpayer's principal residence. King v. Commissioner, 72 T.C. 349, 355 (1979). A taxpayer must live in a house on a regular day-to-day basis in order for the house to be his "principal residence" within the meaning of section

1034.  United States v. Sheahan, 323 F.2d 383 (5th Cir. 1963); Stolk v. Commissioner, supra at 353; Bayley v. Commissioner, 35 T.C. 288, 297 (1960).

Petitioners acquired 20 The Point on August 31, 1988, and sold it on March 9, 1989.  During that period, they spent time at both Mary Street and 20 The Point.  The distance between Riverside and Coronado is just over 100 miles, and the round-trip drive time is approximately 4 hours.

Petitioners' case rests primarily upon Terry's testimony. We are not required to accept his testimony as gospel, even though it is not controverted.  We may take into account whether it is questionable.  Kean v. Commissioner, 51 T.C. 337, 343-344 (1968), affd. in part and revd. in part 469 F.2d 1183, 1188 (9th Cir. 1972); Simon v. Commissioner, T.C. Memo. 1981-198.  At trial, Terry stated that petitioners believed that 20 The Point became their principal residence as of August 1, 1988.  According to Terry, between August 31, 1988, and March 1, 1989, he spent the majority of his time in California at 20 The Point.  However, as with most of Terry's testimony on direct examination, leading questions were prevalent,[3] resulting in a credibility issue.

---

[3]  During the direct examination of Terry, the Court expressed the following concerns:

> while leading questions are not always objectionable, I can tell you that I give much more credence to the witness' testimony than the attorney's, and when
> (continued...)

While we have given careful consideration to his testimony, we find it questionable; petitioners did not offer other witnesses to attest to their physical occupancy of 20 The Point.

In weighing the reasonableness of Terry's response that a majority of petitioners' time during the period was spent at 20 The Point, we have considered the following "acts and intentions".

Mary Street:  Mary Street, which was Joyce's family home, was purchased by petitioners in 1973.  Petitioners raised their children there from 1973 to 1980.

Petitioners continued to own their Mary Street property until 1993, 4 years after 20 The Point was sold.  Before to its sale, Mary Street was never rented out.  Petitioners contend that they had attempted to sell Mary Street since 1985, and that it took 8 years to sell the property.  However, Terry testified that he could not remember the date when the property was listed, and

---

[3](...continued)
         attorneys state a series of facts and say, is that
         right, yes, or no, I have to assume that there's some
         reason they're doing it that way and it's not always to
         your benefit that I make those assumptions.  So I would
         like to hear the witness.

Later during the direct examination of Terry, the Court stated the following to petitioners' attorney:

         You have a habit of leading the witness, and that's not
         a good habit. * * * I want the witness' testimony, not
         yours.  He's the one that took the oath.

petitioners presented no information to corroborate the listing of the property during 1985 or in any year thereafter.

Petitioners' presence at Mary Street was necessary in part because of its maintenance requirements. In addition to the caretakers, petitioners undertook many of the tasks involved in maintaining the property, such as oiling the citrus groves for weeds and maintaining the fields. While the citrus groves may have been a burden on petitioners, they continued to spend time at the property.

Family Connections: Petitioners' children, Marc and Julie, and their grandchildren lived in Riverside in 1988. Additionally, at least one parent lived in neighboring San Bernardino during 1988.

Business Location: While Terry's work primarily started in Riverside in the 1950's, he had an increasing presence in the San Diego area in the 1970's and 1980's. Petitioners contend that the location of 20 The Point in the San Diego area was important to their business and that the Corporation's business needs at the Alessandro office diminished.

In light of the following, we do not think that Terry's business leads to the conclusion that petitioners spent the majority of their time at 20 The Point. While the Corporation (which was liquidated in August 1988) used 30 The Point and 20 The Point as an office and place for entertaining, it never

acquired any San Diego office space other than 20 The Point in 1986, 1987, and 1988. Instead, at all times, Terry continued to maintain the Alessandro office in Riverside. As with Mary Street, petitioners suggested that they tried to sell the Alessandro office, but it was difficult to sell. However, they presented no documentary evidence to corroborate this statement.

As of January 1, 1987, Terry became an employee of Academy, and with the Corporation's liquidation in August 1988 Terry was no longer self-employed. In regard to his employment with Academy, Terry's job expanded outside California, requiring extensive travel. During a substantial portion of the period at issue, and in particular from August 31 to September 23, Terry was traveling regularly outside California on business. When Terry traveled, Joyce stayed at Mary Street or remained at 20 The Point.

Furnishings: We know that, at a minimum, petitioners lived at Mary Street for 15 years (1973-88). Yet there is no record of moving any belongings from Riverside to Coronado. In response to this observation, petitioners point to the fact that the Corporation purchased 20 The Point fully furnished, and upon liquidation petitioners received the furnishings. Therefore, according to petitioners, there was no need to hire a moving van to move belongings from Mary Street to 20 The Point. However, this explanation is questionable considering the fact that

petitioners hired a moving van for the move from 20 The Point to 15 Sandpiper when they purchased 15 Sandpiper furnished at a cost of $250,000.

Bills and Patterns of Usage:  In response to respondent's discovery requests, petitioners produced limited documents: (a) water bill from 20 The Point for the period May 2, 1983 to March 9, 1989; (b) phone bill for 20 The Point for the period January 2 to February 2, 1989; and (c) Terry's business American Express Card bill for 1988 and 1989.  Terry testified that these documents were the only ones that he could locate.  He could not find relevant documents for the complete period at issue for any of the three properties:  20 The Point, Mary Street, and 15 Sandpiper.  From the submitted documents, we cannot make any type of comparison.

Respondent requests that we draw a negative inference from petitioners' failure to produce all the documents requested. Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, (1946), affd. 162 F.2d 513 (10th Cir. 1947).  In response, petitioners state that "petitioners are not obligated and cannot be expected to retain all of their personal records for such a long time period."  We note that the lack of bills contributes to the lack of concrete evidence regarding petitioners' occupancy of 20 The Point.

Address Used for Mail:  We consider how petitioners reported their address on tax forms.  Friedman v. Commissioner, T.C. Memo. 1982-178.  Petitioners' 1988 Forms W-2 went to Mary Street, and their 1989 and 1990 Forms W-2 were mailed to the Alessandro office.  For 1988 and 1989, their Forms 1099 went to Mary Street.

While some documents[4] listed 20 The Point as petitioner's address, numerous documents dated after August 31, 1988, listed Mary Street as petitioners' address.  These included petitioners' investment statements from Paine Webber, Prudential Securities, and PGF Securities.  In reaching petitioners, the administrator for petitioner's pension plan and petitioners' accountant McKenzie used the Mary Street address.  Further, on agreements regarding 15 Sandpiper, petitioners listed Mary Street as their address.

At trial, Terry testified that he "felt more secure about having their mail delivered at [the] 2320 Mary Street property than at 20 The Point."  According to petitioners, the caretaker at Mary Street would receive the mail daily and place it in the garage.  Then, periodically, petitioners would pick up the mail.  Further, on brief, petitioners state that they "did not want to burden themselves with having to change all of their records to

---

[4]  20 The Point was listed as petitioners' address on a letter to Security Pacific National Bank, a San Diego Country Club Membership Application, a Fire Insurance Exchange Declaration, and Pacific Bell statements.

reflect a new mailing address when it was not necessary." However, petitioners' explanation seems questionable considering that the documents delivered often required immediate notice and that delivery at Mary Street required petitioners to pick up the mail personally more than 100 miles from 20 The Point.

Location of Banks:  Petitioners continued to maintain their bank accounts at Inland National Bank in Riverside in 1988, 1989, and 1990.  At trial, Terry testified that the bank's location was of no consequence because his presence was not required.  As with most of Terry's examination, the above responses were obtained by Terry's merely responding "yes" or "no" to leading questions.

Churches:  Between 1980 and 1989, petitioners were members of either Palm Baptist Church or Magnolia Avenue Baptist Church, located in Riverside.  But petitioners also attended various churches from San Diego to Palm Springs, such as Skyline Wesleyan Church in San Diego.  This indicates petitioners' presence in both Riverside and Coronado.

Country Club Memberships:  Petitioners' membership in the Coronado Country Club as resident members was initiated for business reasons to establish connections in the San Diego area. This was consistent with the business at 20 The Point (entertaining clients, etc.).  At the same time, petitioners were also members of the Shrimers Pictoria Country Club in Riverside. This indicates petitioners' presence in both Riverside and Coronado.

Homeowners' Exemption, Voter Registrations, and Driver's Licenses: Respondent points out the following facts. First, no homeowners' exemption was filed regarding 20 The Point. Second, petitioners' voter registration renewals, dated November 29, 1989, did not reflect 20 The Point as their address. Instead, the renewals changed petitioners' address from Mary Street to 15 Sandpiper. Third, petitioners did not report 20 The Point to the California Department of Motor Vehicles.

In regard to the homeowners' exemption, petitioners acquired 20 The Point on August 31, 1988, but at that time, they already had filed and obtained a homeowners' exemption for 1988 on Mary Street. Under California law, the eligibility for homeowners' exemption is determined as of the "lien date", which is March 1 of each year. Cal. Rev. & Tax. Code sec. 2192 (1987). Affidavits for a homeowners' exemption are required to be filed after the claimant becomes eligible but no later than April 15. Cal. Rev. & Tax. Code sec. 255(b)(1987). By the following year (1989), petitioners had sold 20 The Point (March 9, 1988) and acquired 15 Sandpiper (November 21, 1988). As a result, petitioners received a homeowners' exemption for 1989 on 15 Sandpiper, having owned the property as of the lien date. See Cal. Rev. & Tax. Code sec. 253.5 (1987). Therefore, the fact that petitioners did not apply for a homeowners' exemption on 20 The Point is of little significance, given that their actions

were consistent with California's homeowners' exemption procedures.

In regard to the driver's license and the voter registrations, petitioners acquired 20 The Point on August 31, 1988, and within 3 months they had purchased 15 Sandpiper. Because of the short time involved, we do not consider it significant that 20 The Point was not listed on either petitioners' driver's licenses or voter registrations.

Conclusion

After considering the record as a whole, and on balance, we find that 20 The Point was not petitioners' principal residence during the relevant period. In our judgment, their principal residence was Mary Street. Therefore, we sustain respondent's determination that section 1034 is inapplicable and hold that petitioners must recognize the gain on the sale of 20 The Point in 1989.

Issue 2. Accuracy-Related Penalty

Respondent determined an accuracy-related penalty pursuant to section 6662(a) for petitioners' 1989 tax year. Section 6662 imposes a penalty equal to 20 percent of the portion of an underpayment of tax that is attributable to "negligence or disregard of rules or regulations." Sec. 6662(a) and (b)(1). The term "negligence" includes "any failure to make a reasonable attempt to comply with the provisions of this title," and the term "disregard" includes "any careless, reckless, or intentional

disregard." Sec. 6662(b). A taxpayer has the burden of proving that the Commissioner's determination of an addition to tax is in error. Luman v. Commissioner, 79 T.C. 846, 860-861 (1982).

The accuracy-related penalty of section 6662 does not apply to any portion of an underpayment if there was reasonable cause for such portion and the taxpayer acted in good faith. Sec. 6664(c)(1). The most important factor is the extent of the taxpayer's efforts to assess his proper tax liability for the year. Sec. 1.6664-4(b)(1), Income Tax Regs. Such a determination is made by taking into account all facts and circumstances, including the experience, knowledge, and education of the taxpayer. Id. Reliance by the taxpayer on the advice of a qualified adviser will constitute reasonable cause and good faith if, under all of the facts and circumstances, such reliance was reasonable and the taxpayer acted in good faith. Id.

On their 1989 Federal income tax return, petitioners reported no gain from the sale on 20 The Point, rolling over a gain of $341,710. Later, petitioners agreed to the revenue agent's recalculation of gain to be $503,250.

Petitioners assert that they believed they were entitled to the benefits of section 1034; yet they presented little evidence to support their belief. Petitioners argue that their actions in establishing 20 The Point as their principal residence and making the subsequent sale were in "ignorance" of the existence of the Internal Revenue Code provisions.

In view of petitioners' lack of formal training in tax or accounting, they argue that they relied on McKenzie for advice in the preparation of their tax returns to assure compliance with rules and regulations. In June 1988, before the Corporation's liquidation, petitioners met with their tax attorney and McKenzie, who is a certified public accountant. At that time, petitioners told McKenzie of their intention to "live at 20 The Point more or less indefinitely." Terry notified McKenzie that they sold 20 The Point after the sale occurred, and he notified McKenzie after the agreement to purchase 15 Sandpiper was signed. This was consistent with petitioners' habit of informing McKenzie after an event occurred.

In preparing petitioners' tax return, McKenzie testified that in reaching his opinion that section 1034 applied, he relied upon Terry for a determination of which residence he should reflect as their personal residence. More specifically, he relied on Terry's statement in June 1988 that petitioners were going to live at 20 The Point more or less indefinitely. Further, petitioners did not inform McKenzie, and he was unaware, of petitioners' use of 20 The Point, of the addresses used by them on their tax forms, and of other circumstances bearing on whether and when 20 The Point was their principal residence. Under the facts and circumstances, we conclude that petitioners have failed to prove that their reliance on McKenzie was reasonable and that they acted in good faith.

We also note that petitioners were careless by not retaining sufficient records to establish 20 The Point as their principal residence.  On the basis of the record as a whole, we also conclude that petitioners have not carried their burden of proving that they acted with reasonable cause.  Therefore, we hold that they are liable for the accuracy-related penalty for negligence under section 6662(a).

To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155.</u>